The STATE of Ohio, Appellant,

v.

NORWOOD et al., Appellees.

[Cite as *State v. Norwood* (1992), 83 Ohio App.3d 451.]

Court of Appeals of Ohio,
Summit County.

Nos. 15705, 15727.

Decided Nov. 4, 1992.

*Lynn Slaby,* Summit County Prosecuting Attorney, and *Philip D. Bogdanoff,* Assistant Prosecuting Attorney, for appellant.

*Susan Fitch,* for appellee Norwood.

*Thomas Ciccolini,* for appellee Davis.

CACIOPPO, Presiding Judge.

On Tuesday, January 28, 1992, Akron Police Officers Richard Oldaker and Allan Fitch patrolled South Akron in their marked police cruiser. At approximately 2:00 a.m., police headquarters dispatched the officers to the area of Sylvan and Jenkins Streets to investigate a complaint that gunshots had been fired there. The officers turned from their course onto Wilbeth Avenue, heading east. They crossed over Interstate 77 and approached the intersection of Wilbeth and Inman Streets, coming within three blocks of the intersection of Sylvan and Jenkins Streets.

The officers noticed a blue Mercury Cougar, heading down Wilbeth Road in the opposite direction of their cruiser. The Cougar slowed to make a right turn onto Inman Street. As the police cruiser passed the Cougar at the intersection, Officer Oldaker noticed four men riding in the Cougar; each man turned to take a long look at the police officers when the cruiser passed.

Oldaker and Fitch decided to follow the Cougar. They continued east on Wilbeth, and turned left at the next road, Virginia Street. The officers continued two blocks on Virginia to Reed Avenue. There, the officers saw the taillights of an automobile heading west on Reed. Oldaker shut off the cruiser's headlights, turned left onto Reed, and sped up to catch the automobile ahead. As the cruiser approached the intersection of Reed and Inman, Oldaker turned on the headlights. He recognized the car in front of him as the blue Mercury Cougar, and

testified that the Cougar appeared to speed up when he turned on the cruiser's headlights. The Cougar turned south onto Hammel Street, west onto Wilbeth, and north onto Interstate 77. Oldaker and Fitch followed, eventually stopping the Cougar on the berm of Interstate 77.

As Oldaker and Fitch exited their car and approached the Cougar, they noticed the front passenger and driver bend over and move around in the front seat. The officers drew their weapons and held them at their sides. Oldaker walked to the driver's side of the Cougar, recognized the driver as Jamar Hooks, and asked him for his driver's license. Hooks did not have a license and Oldaker ordered him to step out of the car. As Hooks exited the car, a spent shell casing fell off his lap onto the front seat. Oldaker immediately pulled Hooks to the back of the Cougar, patted him down, and found a bag of marijuana in his possession.

Fitch stayed with Hooks, and Oldaker approached the Cougar again. Oldaker ordered the front seat passenger out of the car, patted him down, and found eleven .22 caliber bullets in his coat pocket. He then searched the car's glove box and found a .22 caliber revolver.

Oldaker next turned his attention to one of the rear passengers, Ronnie Norwood. He ordered Norwood out of the car and noticed a metal, antenna-like object on the floor where Norwood had been sitting. Oldaker retrieved the metal object, a crack pipe. The substance inside the pipe field-tested positive as crack cocaine.

Norwood and Davis were indicted for various criminal charges. Before trial, both moved the court to suppress the evidence seized by the police in the search of January 28, 1992. After a hearing, the trial court suppressed the evidence from being admitted in the trials of both men. The state appealed, asking this court to reverse the trial court's suppression orders, and we have consolidated the two cases to expedite their appeals. We address the state's one assignment of error.

### Assignment of Error I

"The trial court committed error when it suppressed the evidence in this case."

The Fourth Amendment to the United States Constitution, and Section 14, Article I, of the Ohio Constitution protect against "unreasonable searches and seizures" committed by government officers acting without a warrant. If an officer acts without a warrant, the state must prove that the officer's actions came within one of the following judicially recognized exceptions:

"(a) A search incident to a lawful arrest;

"(b) consent signifying waiver of constitutional rights;

"(c) the stop-and-frisk doctrine;

"(d) hot pursuit;

"(e) probable cause to search, and the presence of exigent circumstances; or

"(f) the plain-view doctrine." *State v. Akron Airport Post No. 8975* (1985), 19 Ohio St.3d 49, 51, 19 OBR 42, 43, 482 N.E.2d 606, 608. See, also, *Xenia v. Wallace* (1988), 37 Ohio St.3d 216, 524 N.E.2d 889, at paragraphs one and two of the syllabus.

The Supreme Court of the United States introduced the "stop and frisk" doctrine in *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. In that case, the court allowed a police officer to stop and conduct a pat-down search of an individual whom the officer believed to possess a dangerous weapon. To justify the search, the court required that the officer " * * * point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. * * * And in making that assessment it is imperative that the facts be judged against an objective standard: would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?" *Id.*, 392 U.S. at 21–22, 88 S.Ct. at 1880, 20 L.Ed.2d at 906.

■ In recent years, the court has extended the "stop and frisk" doctrine to a variety of factual settings. One of those factual settings is the stop of a motor vehicle. Police officers commit a "seizure" within the meaning of the Fourth and Fourteenth Amendments when they stop an automobile and detain its occupants. *Delaware v. Prouse* (1979), 440 U.S. 648, 653, 99 S.Ct. 1391, 1395–1396, 59 L.Ed.2d 660, 667. They must have specific and articulable facts giving rise to a reasonable suspicion of criminal activity to stop and detain a motor vehicle. *Id.;* *State v. Chatton* (1984), 11 Ohio St.3d 59, 61, 11 OBR 250, 251, 463 N.E.2d 1237, 1239; *State v. Heinrichs* (1988), 46 Ohio App.3d 63, 65, 545 N.E.2d 1304, 1306–1307; *State v. Key* (Mar. 21, 1990), Summit App. No. 14289, unreported, at 4, 1990 WL 34857. We determine whether a police officer had reasonable suspicion to make an investigative stop in light of the totality of the surrounding circumstances. *State v. Key, supra,* citing *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044, paragraph one of the syllabus; *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489, paragraph one of the syllabus.

■ Only Officer Oldaker testified at the suppression hearing. From his testimony, the trial court concluded that Oldaker did not enunciate specific and articulable facts indicating a reasonable suspicion that the occupants of the Cougar were involved in criminal activity. We disagree. As the facts in this case were uncontested, we exercise our prerogative to review the trial court's legal conclusion *de novo*. *State v. Miller* (July 31, 1991), Summit App. No. 14973, unreported, at 4, 1991 WL 149582.

When the officers first noticed the Cougar, it was within three blocks of the reported shooting. It was the only other vehicle on the road. Also, all the occupants of the Cougar took a long look at the officers. The officers then tried to inconspicuously follow the Cougar, and Oldaker turned off the cruiser's headlights. When Oldaker turned on the cruiser's headlights, the Cougar appeared to speed up. Finally, after the occupants of the Cougar first noticed the police cruiser, the Cougar turned off Wilbeth, went in a circular route, and turned back onto Wilbeth, heading in the same direction. The police officers reasonably inferred that the driver of the Cougar took this route to elude the police. These facts, taken together, gave rise to the officers' reasonable suspicion that the occupants of the Mercury Cougar had engaged in criminal activity.

Having established the propriety of the investigative stop of the Cougar, we next turn to the legality of the search of the vehicle and its occupants. As the police conducted this search without a warrant, we look to see whether it falls within one of the judicially recognized exceptions. The searches of Norwood and Davis clearly fall within the stop-and-frisk doctrine of *Terry* and its progeny. The officers acted out of a reasonable fear that the occupants of the car possessed dangerous weapons.

After stopping the Cougar, Oldaker testified that as he first approached the car, he noticed the driver and front seat passenger bend over and move around the seat. The officers drew their weapons and held them at their sides. At this point, the officers had reason to believe the occupants of the Cougar possessed dangerous weapons. Moreover, the Supreme Court of Ohio has held that if a police officer, making an investigative stop of a motor vehicle, sees the occupants of the vehicle furtively conceal something under the seat, the officer may make a limited search of that area for the purpose of the officer's protection. *State v. Smith* (1978), 56 Ohio St.2d 405, 10 O.O.3d 515, 384 N.E.2d 280, paragraph one of the syllabus. Thus, the officers had the right to search the cab of the Cougar for weapons, and to conduct a pat-down search of the occupants of the car for weapons.

Finally, we review the propriety of Officer Oldaker's search of the glove box of the Cougar. The Supreme Court of the United States has recently set out a test to determine what areas of an automobile police officers may examine while conducting a protective search of a vehicle for dangerous weapons. Police may search those areas of the passenger compartment under the immediate control of the occupants of a car, where the occupants could presumably reach for a weapon. *Michigan v. Long* (1983), 463 U.S. 1032, 1050–1051, 103 S.Ct. 3469, 3481, 77 L.Ed.2d 1201, 1221. Under this test, Oldaker had the right to search the glove box of the Cougar.

We find that the officers had a reasonable suspicion to stop the automobile in which the appellees were riding. Moreover, the officers had a reasonable belief that the appellees possessed dangerous weapons. This belief further justified their pat-down search of appellants, and their protective search of the automobile.

The appellant's assignment of error is well taken.

The judgment of the trial court is reversed and the cause is remanded for further proceedings consistent with this opinion.

*Judgment reversed*
*and cause remanded.*

REECE and COOK, JJ., concur.