The STATE of Ohio, Appellant,

v.

NEALEN, Appellee.

[Cite as *State v. Nealen* (1992), 84 Ohio App.3d 235.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 63381.

Decided Dec. 14, 1992.

*Stephanie Tubbs Jones,* Cuyahoga County Prosecuting Attorney, and *Paul J. Daley,* Assistant Prosecuting Attorney, for appellant.

*Ralph M. Klopp,* for appellee.

_____

*Per Curiam.*

The state appeals from the trial court's order granting defendant's motion to suppress evidence. The following facts were adduced at the hearing on defendant's motion.

Det. Hancock testified he was a twenty-year veteran of the Cleveland Police Department and a thirteen-year member of the department's strike force. He further stated he had made over one thousand drug arrests in his career as a police officer.

Det. Hancock testified that at approximately 5:00 p.m. on July 25, 1991, he and two other officers were patrolling a Cleveland Metropolitan Housing Authority project known as the "Wilson Estates." He testified he and the other officers were on a *routine patrol* of the area, which is known as an "extremely high crime area of prostitution, drugs, assaults, even homicides." He further stated they patrolled the area "at least once, if not many times during our shift" and that it was an "all black area." Det. Hancock also testified he was sitting in the rear passenger seat of the unmarked police car [1] and that he and his colleagues were in plainclothes.

Det. Hancock testified the police car had just turned into Chester Court from East 55th Street. As the officers pulled into a parking lot adjoining a courtyard, "which is like the main hub of activity in that area," they observed a young white male, defendant Richard Nealen herein, who was coming from the courtyard and approaching a parked car. Det. Hancock stated the following concerning what transpired thereafter:

"We then drove to where the car was. As the male was attempting to enter his car, *we identified ourselves as policemen, and asked him what he was doing*?

"At that time, we observed that he had his left hand closed in a tight fist. *We asked him what he had in his hand? He then attempted to enter the car,* and we [*sic,* he] put his hand on, like you call the door jamb, and a rock of cocaine popped out onto the ground, and one popped out onto the driver's seat.

"We then exited our police vehicle. I retrieved the rock of suspected crack cocaine that fell to the ground. Detective Tim asked the male to step out of the car. He retrieved the rock that was on the driver's side that had fallen inside the car.

_____

1. Det. Hancock stated that although the car was unmarked, it was an " '84 Ford Fairlane, four-door, that's now eight years old. It's kind of like everybody knows what it is * * *. Six-year-old kids say, 'Hi, policeman,' when we drive by."

"At that time Mr. Nealen was placed under arrest for VDSL, and read his rights.

"THE COURT: For what?

"THE WITNESS: For violation of Drug State Law. He was read his rights and placed in the car. Prior to being placed in his car, he was given a search for weapons and other contraband, and found to have a crack pipe in his, I think he was wearing shorts, in his shorts' pocket. That's about the end of that. We towed his car and took him back to the station and booked him for drugs." (Emphasis added.)

Det. Hancock stated that at no time prior to the inadvertent "discovery" of the suspected rocks of cocaine did the officers exit their car, display any type of threatening gestures, or attempt to restrain defendant's freedom of movement. However, he did state that the officers approached defendant because they had a "suspicion" and that defendant "tended to stick out in that area a little bit."

Defendant was thereafter indicted by the Cuyahoga County Grand Jury on a one-count indictment alleging violation of R.C. 2925.11, drug abuse, *viz.*, possession of cocaine in less than the bulk amount. Defendant pleaded not guilty at his arraignment. Thereafter, defendant filed a motion to suppress evidence on the basis that the officers lacked probable cause to justify their "investigatory stop and subsequent search and seizure."

The trial court held a hearing on defendant's motion to suppress evidence. Following Det. Hancock's testimony and the arguments of counsel, the trial court granted defendant's motion to suppress and ordered defendant discharged, stating the basis of its decision thus:

"I don't believe that the facts as asserted by the police officer—well, I understand what he did and why he did it—justify any intrusion into the privacy of this Defendant."

The state has filed a timely appeal of the trial court's order pursuant to Crim.R. 12(J) and presents the following as its sole assignment of error for review:

"The trial court erred in suppressing evidence that was discovered prior to when the suspect was stopped within the meaning of the Fourth Amendment."

This assignment of error lacks merit.

The state argues there was no "investigatory stop" in the case *sub judice;* therefore, defendant's Fourth Amendment rights could not have been violated by the actions of the police officers toward him. This argument is not persuasive.

The salient facts of the case as stated in the testimony of Det. Hancock are the following: (1) the police officers were on *routine patrol;* (2) the police officers were in a "black neighborhood"; (3) the police saw defendant, a white male, going toward his car with "his left hand closed in a tight fist"; (4) the officers approached defendant on a *suspicion;* (5) the officers identified themselves as policemen; (6) the officers asked defendant "what he was doing"; (7) the officers asked defendant "what he had in his hand"; (8) defendant then accidentally dropped two rocks of cocaine. These words, "police," "what are you doing," and "what do you have in your hand," denote an investigatory stop. The police wanted an answer; otherwise, they would not have asked the questions after identifying themselves as policemen. The foregoing facts clearly demonstrate a complete absence of "articulable facts" upon which to base an approach or stop of defendant. Defendant was doing nothing wrong. Since Det. Hancock's stop of defendant was unreasonable, it constituted an unreasonable seizure in violation of appellant's Fourth Amendment rights; therefore, the evidence thus obtained, *viz.,* the rocks of cocaine which "popped out" of defendant's hand as he attempted to enter his vehicle, was properly suppressed as the "fruit of a poisonous tree."

In relevant part, Det. Hancock's testimony on cross-examination follows:

"Q: Is there any—what observable facts did you observe that would lead you to believe that my client was up to criminal behavior?

"A: Things did not fit, all right. We had a *suspicion* that maybe something was going wrong. Ninety-five percent of our work is, there's a suspicion of something going wrong.

"Q: So there were no facts, correct?

"A: *No, it was just our suspicion.*

" * * *

"THE COURT: You weren't investigating a particular offense, per se?

"THE WITNESS: No, we were not there for any specific purpose, other than to just see what we can see." (Emphasis added.)

Furthermore, in addition to the lack of "specific and articulable facts" upon which to base the initial approach of defendant in the case *sub judice,* Det. Hancock asked defendant what defendant's purpose was for being in the neighborhood. A reasonable person could assume he was not free to leave at this point. Consequently, it is clear Det. Hancock conducted an "investigative stop" of defendant. *Brown v. Texas* (1979), 443 U.S. 47, 99 S.Ct. 2637, 61 L.Ed.2d 357.

On this issue, the Supreme Court stated the following in *State v. Andrews* (1991), 57 Ohio St.3d 86, 87–88, 565 N.E.2d 1271, 1273–1274:

"In *Terry* [*v. Ohio*, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889], the United States Supreme Court held that a police officer may stop and investigate unusual behavior, even without probable cause to arrest, *when he reasonably concludes that the individual is engaged in criminal activity. In assessing that conclusion, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'* Id. at 21–22 [88 S.Ct. at 1880, 20 L.Ed.2d at 906]. Furthermore, the standard against which the facts are judged must be an objective one: '[W]ould the facts available to the officer at the moment of the seizure or the search "warrant a man of reasonable caution in the belief" that the action taken was appropriate?' *Id.* at 21–22 [88 S.Ct. at 1880, 20 L.Ed.2d at 906].

" * * * [C]ourts have concluded that *an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture—a totality of the surrounding circumstances. Id.* [*United States v. Cortez*, 449 U.S. 411] at 417–418 [101 S.Ct. 690, 694–695, 66 L.Ed.2d 621, 628–629]; *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489; *United States v. Rickus* (C.A.3, 1984), 737 F.2d 360, 365. * * *

" * * * *

" * * * An area's reputation for criminal activity is an articulable fact which is a *part* of the totality of circumstances surrounding a stop to investigate suspicious behavior. *Bobo, supra,* at 179, 524 N.E.2d at 491; [*State v.*] *Freeman* [64 Ohio St.2d 291, 18 O.O.3d 291, 414 N.E.2d 1044], *supra.* See, also, *United States v. Magda* (C.A.2, 1976), 547 F.2d 756, 758; certiorari denied (1977), 434 U.S. 878 [98 S.Ct. 230, 54 L.Ed.2d 157]." (Emphasis added.)

In the case *sub judice,* however, "the area's reputation for criminal activity" is the *only* articulable fact Det. Hancock could point to in order to justify the officers' approach. The facts that defendant was white and was "clenching his fist" are insufficient to support a "reasonable suspicion" defendant "might be engaged in criminal activity." Cf. *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489.

Indeed, the facts of the case *sub judice* are similar to those faced by the United States Supreme Court in *Brown v. Texas, supra.* In *Brown,* appellant was arrested after refusing to identify himself to a police officer who had stopped appellant as he was walking in an alley in a "high crime area" because he "looked suspicious." In overturning appellant's conviction, the Supreme Court stated as follows:

"The flaw in the State's case is that none of the circumstances preceding the officers' detention of appellant justified a reasonable suspicion that he was involved in criminal conduct. Officer Venegas testified at appellant's trial that

the situation in the alley 'looked suspicious,' but he was unable to point to any facts supporting that conclusion. There is no indication in the record that it was unusual for people to be in the alley. *The fact that appellant was in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct.* In short, the appellant's activity was no different from the activity of other pedestrians in that neighborhood. When pressed, Officer Venegas acknowledged that the only reason he stopped appellant was to ascertain his identity. The record suggests an understandable desire to assert a police presence; however, that purpose does not negate Fourth Amendment guarantees.

"In the absence of any basis for suspecting appellant of misconduct, the balance between the public interest and appellant's right to personal security and privacy tilts in favor of freedom from police interference." (Emphasis added.) *Id.,* 443 U.S. at 51–52, 99 S.Ct. at 2641, 61 L.Ed.2d at 362–363.

Furthermore, this is the law as articulated by the Ohio Supreme Court as well.

The facts of *State v. Williams* (1990), 51 Ohio St.3d 58, 554 N.E.2d 108, upon which the state relies in its brief to this court, are inapposite to those of the case *sub judice.* In *Williams,* Deputy Sheriff Garst was *investigating a complaint of a possible theft* of produce from a rural garden. When the deputy arrived at the property, he proceeded to walk down a path past some fields; eventually he discovered *marijuana plants growing* on the property. Garst then returned to his vehicle and radioed for assistance. As he waited, he proceeded to investigate the property further. During that time, defendant Williams arrived at the property and parked his truck behind Garst's car.

Garst soon thereafter saw defendant Williams, approached him, and asked Williams what he was doing there. Williams' response, *viz.,* that he was there to squirrel hunt, *aroused Garst's suspicions* since it was not squirrel hunting season and Williams was not carrying a gun. At that point, Garst asked Williams to accompany him back to his vehicle.

When they arrived at Garst's vehicle, Garst patted Williams down and found a knife and several .22 caliber shells. When Garst asked Williams where the gun was, Williams said it was in his truck. Garst thereupon walked over to the truck and saw the gun through the window. Williams was subsequently indicted for and convicted of having a weapon while under a disability in violation of R.C. 2923.13(A)(3).

On these facts, the Supreme Court of Ohio held Williams' motion to suppress evidence was properly denied by the trial court. It is clear that *prior to Garst's approach* of Williams, Garst could point to several "specific and articulable facts which, taken together with rational inferences from those facts," reasonably

warranted an intrusion into Williams' privacy. *Id.* Garst had received a complaint of criminal activity, and had seen evidence thereof in the form of growing marijuana plants and a path which led to them. Thus, when Garst saw Williams, he could reasonably inquire as to Williams' purpose for being on the property. In contrast, in the case *sub judice,* there were *no* facts justifying an intrusion into defendant's privacy.

The state also cites *Michigan v. Chesternut* (1988), 486 U.S. 567, 108 S.Ct. 1975, 100 L.Ed.2d 565, in support of its argument that the police actions in the case *sub judice* were reasonable. Once again, however, the facts of *Chesternut* are distinguishable from those of the case *sub judice.*

In *Chesternut,* some police officers on routine patrol saw a man exit a car and approach Chesternut. When Chesternut saw the officers' patrol car, he turned and began to run. The officers followed Chesternut "to see where he was going," caught up with him and drove alongside him for a short distance. The officers neither attempted to stop defendant nor made any inquiries of him. The officers then observed Chesternut pull a number of packets from his pocket and discard them. The officers stopped, and one officer retrieved the packets. The packets contained pills which, from that officer's experience, appeared to be narcotics. Chesternut, who had stopped running, was thereupon arrested for possession of narcotics; a later search of Chesternut's person revealed more narcotics and paraphernalia. Subsequently, Chesternut moved to suppress the evidence obtained by the officers on Fourth Amendment grounds. The trial court granted Chesternut's motion, and the Michigan Court of Appeals affirmed the trial court's decision.

On appeal to the United States Supreme Court, the decisions of the Michigan courts were reversed. The Supreme Court stated its rationale thus:

"In *Terry v. Ohio,* the Court noted:

"'Obviously, not all personal intercourse between policemen and citizens involves "seizures" of persons. Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude that a "seizure" has occurred.' 392 U.S., at 19 [88 S.Ct. at 1879, 20 L.Ed.2d at 905], n. 16.

"A decade later in *United States v. Mendenhall,* Justice Stewart, writing for himself and then Justice Rehnquist, first transposed this analysis into a *test to be applied in determining whether 'a person has been "seized" within the meaning of the Fourth Amendment.'* 446 U.S. [544], at 554 [100 S.Ct. 1870, at 1877, 64 L.Ed.2d 497, at 509 (1980) ]. [Footnote omitted.] The test provides that the *police can be said to have seized an individual 'only if, in view of all of the circumstances surrounding the incident, a reasonable person would have be-*

*lieved that he was not free to leave.' Ibid.* The Court has since embraced this test. [Citations omitted.]

" * * *

" * * * The test's objective standard—looking to the reasonable man's interpretation of the conduct in question—allows the police to determine in advance whether the conduct contemplated will implicate the Fourth Amendment. * * *

"Applying the Court's test to the facts of this case, we conclude that *respondent was not seized by the police before he discarded the packets* containing the controlled substance. * * * [T]he police conduct involved here would not have communicated to the reasonable person an attempt to capture or otherwise intrude upon respondent's freedom of movement. [Footnote omitted.] The record does not reflect that the police activated a siren or flashers; or that they commanded respondent to halt, or displayed any weapons; or that they operated the car in an aggressive manner to block respondent's course or otherwise control the direction or speed of his movement. * * * While the very presence of a police car driving parallel to a running pedestrian could be somewhat intimidating, this kind of police presence does not, standing alone, constitute a seizure. [Footnote omitted.] * * * Without more, *the police conduct here*—a brief acceleration to catch up with respondent, followed by a short drive alongside him—*was not 'so intimidating' that respondent could reasonably have believed that he was not free to disregard the police presence and go about his business.* [Citation omitted.] The *police therefore were not required to have 'a particularized and objective basis for suspecting [respondent] of criminal activity,'* in order to pursue him. [Citation omitted.]" (Emphasis added.) *Id.,* 486 U.S. at 573–576, 108 S.Ct. at 1979–1981, 100 L.Ed.2d at 571–573.

In *Chesternut,* therefore, the officers never "seized" defendant, they merely followed him; furthermore, defendant voluntarily threw away the contraband while he was running. In the case *sub judice,* however, the officers *drove up to* defendant, *identified* themselves as *policemen, asked him what he was doing* and *what he had in his hand.* Clearly, the police presence was intimidating, they expected an answer, and a reasonable person could assume he was not free to leave until the officers were satisfied with a response. Moreover, at that point defendant *accidentally* dropped the contraband; it was not a voluntary act, but occurred only after the officers' stop and interrogation of defendant.

In *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237, the Ohio Supreme Court stated the following:

"It is firmly established that the detention of an individual by a law enforcement officer must, at the very least, be justified by 'specific and articulable facts'

indicating that the detention was reasonable. *Terry v. Ohio* (1968), 392 U.S. 1, 21–22 [88 S.Ct. 1868, 1880–1881, 20 L.Ed.2d 889, 906–907, 44 O.O.2d 383] * * *[.]

" * * *

"In *Brown v. Texas, supra,* the United States Supreme Court held that merely because an individual 'looked suspicious' provided no justification to detain him and demand that he identify himself.

" * * *

" * * * The reality of the situation is that the police officer * * * articulated no specific facts upon which a reasonable suspicion could be based that appellee was violating the law." *Id.,* 11 Ohio St.3d at 61–62, 11 OBR at 251–252, 463 N.E.2d at 1239.

From the foregoing, it is clear that in the case *sub judice* the initial "stop" of defendant was a violation of his Fourth Amendment rights. That being so, the trial court properly granted defendant's motion to suppress evidence.

Accordingly, the state's assignment of error is without merit and is overruled.

The judgment of the trial court is therefore affirmed.

*Judgment affirmed.*

HARPER and KRUPANSKY, JJ., concur.

NAHRA, P.J., dissents.

NAHRA, Presiding Judge, dissenting.

I respectfully dissent. The facts of this case reflect that no seizure took place until after the police officers saw Nealen drop two rocks of cocaine, which provided probable cause for his arrest.

Detective Hancock was the only witness to testify at the suppression hearing. He stated as follows:

"As we pulled into the parking lot, which adjoins a courtyard, which is like the main hub of activity in that area, we observed a male coming from the courtyard approaching a Pontiac automobile.

"We then drove to where the car was. As the male was attempting to enter his car, we identified ourselves as policemen, and asked him what he was doing?

"At that time, we observed that he had his left hand closed in a tight fist. We asked him what he had in his hand? *He then attempted to enter the car,* and we [*sic,* he] put his hand on, like you call the door jamb, and a rock of cocaine popped out onto the ground, and one popped out onto the driver's seat.

"We then exited our police vehicle. I retrieved the rock of suspected crack cocaine that fell to the ground. Detective Tim asked the male to step out of the car. He retrieved the rock that was on the driver's side that had fallen inside the car.

"At that time Mr. Nealen was placed under arrest for VSDL, and read his rights." (Emphasis added.)

Hancock also testified that the police officers did not get out of their vehicle, did not display any weapons, and did not touch Nealen in any way.

"An arrest requires *either* physical force * * * *or*, where that is absent, *submission* to the assertion of authority." (Emphasis *sic.*) *California v. Hodari D.* (1991), 499 U.S. ——, ——, 111 S.Ct. 1547, 1551, 113 L.Ed.2d 690, 697–698. See, also, *State v. Smith* (1989), 45 Ohio St.3d 255, 544 N.E.2d 239, reversed on other grounds (1990), 494 U.S. 541, 110 S.Ct. 1288, 108 L.Ed.2d 464 (no seizure took place where police asked Smith to "come over here a minute" but did not display weapons, did not threaten Smith, and did not touch Smith or block his exit).

In this case, Nealen did not stop when the police asked him questions, but continued to get into his car. At that point, when reaching into his car, he dropped the rocks of cocaine. Since the initial encounter with police lacked physical force, and since Nealen did not submit but continued on his way, the encounter was not a seizure and did not require reasonable suspicion pursuant to *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889. Nealen's subsequent arrest was not based on the fact that he was a white man in an all-black, high-crime neighborhood, but was based on the rocks of cocaine that he dropped. Therefore, no Fourth Amendment violations occurred, and the motion to suppress should have been denied.