The STATE of Ohio (City of North Olmsted), Appellee,

v.

MEDLAR, Appellant.

[Cite as *State v. Medlar* (1994), 93 Ohio App.3d 483.]

Court of Appeals of Ohio,
Cuyahoga County.

No. 65523.

Decided March 14, 1994.

*Donald P. Albenze,* North Olmsted Prosecuting Attorney, for appellee.

*Robert E. Sweeney Co., L.P.A.,* and *William E. Gerstenslager,* for appellant.

KRUPANSKY, Judge.

Defendant-appellant James G. Medlar ("Medlar") timely appeals from an April 15, 1993 judgment of the Rocky River Municipal Court finding him guilty of driving under the influence of alcohol (DUI) in violation of R.C. 4511.19(A)(3) [1] after denying his motion to suppress evidence. The within appeal was originally dismissed *sua sponte* by this court for lack of a final appealable order, *i.e.,* the record did not contain a journal entry setting forth the disposition of the Rocky

---

1. R.C. 4511.19 states in relevant part as follows: "(A) No person shall operate any vehicle * * * within this state, if any of the following apply: (3) The person has a concentration of ten-hundredths of one gram or more by weight of alcohol per two hundred ten liters of his breath * * *."

River Municipal Court with respect to the within conviction. Thereafter, this court granted appellant's motion for reconsideration and reinstated the appeal.

On December 23, 1992 at approximately 9:50 p.m., Officer Charles Jandecka ("Jandecka") of the city of North Olmsted Police Department discovered a commercial vehicle illegally parked in a fire lane at the Great Northern Mall located within the city of North Olmsted, Ohio. Instead of writing the parking citation and placing it upon the windshield of the vehicle, Jandecka decided to wait for the driver to return to the vehicle in order to personally serve him with the fire lane citation. In the interim, Jandecka drove around the parking lot of the mall and dispensed two other tickets. At the suppression hearing, Jandecka stated he could not remember whether he waited for the other drivers to return so that he could also serve them personally.

Five to ten minutes later, Jandecka returned to the illegally-parked commercial vehicle, which had been parked by appellant Medlar, in order to personally serve Medlar with the parking citation. When Medlar approached and walked to the vehicle, Jandecka sounded his air horn and flashed a spotlight but failed to notify Medlar he was being stopped by police. Medlar, unaware he was the object of the air horn and spotlight, entered his vehicle and began to drive away. Testimony revealed someone else in the parking lot was "mimicking" the air horn. Jandecka then activated his emergency lights, again sounded his air horn and followed the vehicle for "forty or fifty feet" before Medlar stopped the vehicle.

At this time, Medlar exited his vehicle and approached the officer. Jandecka subsequently made "certain observations" which caused him to perform a field sobriety test on Medlar. At the suppression hearing, however, Jandecka failed to articulate these observations. As a result of Medlar's performance on this test, Medlar was placed under arrest for DUI, driving under the influence of alcohol, a violation of R.C. 4506.15(B),[2] a misdemeanor.

Medlar subsequently entered a plea of not guilty and filed a motion to suppress evidence and request for an evidentiary hearing. In his motion, Medlar contended Officer Jandecka lacked probable cause to make the initial stop of Medlar's vehicle. He claimed the stop, therefore, constituted an illegal search and seizure in violation of the Fourth and Fourteenth Amendments to the United States Constitution as well as Sections 10 and 16, Article I of the Ohio Constitution. He further moved the trial court to suppress the results of the field sobriety and

---

2. R.C. 4506.15 states in relevant part as follows: "No person shall do any of the following: (B) Drive a commercial motor vehicle while having an alcohol concentration of four-hundredths of one per cent or more * * *."

blood tests claiming the evidence constituted the "fruit of the poisonous tree" and was, thus, inadmissible.

On April 14, 1993, the Rocky River Municipal Court held an evidentiary hearing to consider Medlar's motion to suppress. The court overruled the motion to suppress finding Officer Jandecka had "reasonable suspicion" to make the stop and personally serve the fire lane citation. As a result of this ruling, Medlar withdrew his not guilty plea and pleaded no contest to an amended charge of violating R.C. 4511.19(A)(3). The trial court found Medlar guilty of violating R.C. 4511.19(A)(3) and sentenced him as follows:

1. A fine of $400 plus costs;

2. Incarceration for sixty days suspended on condition Medlar remain on inactive probation; and

3. Suspension of drivers' license for ninety days with provision Medlar could drive for his employer during working hours.

The instant appeal was timely filed.

Appellant's sole assignment of error follows:

"The trial court erred in overruling appellant's motion to suppress evidence obtained after a warrantless search and seizure which was based solely upon a non-criminal activity, to-wit: issuance of a parking citation, under circumstances wherein the officer waited for appellant to return to his vehicle and operate same."

This assignment has merit.

Appellant essentially challenges the constitutionality of the initial investigatory stop by Officer Jandecka. He further alleges that since the initial stop constituted an illegal search and seizure, the evidence obtained via the field sobriety test and his blood-alcohol level constituted the "fruit of the poisonous tree" and was, thus, inadmissible. *Wong Sun v. United States* (1963), 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441, and progeny.

In *Terry v. Ohio* (1968), 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the United States Supreme Court first held the Fourth Amendment to the United States Constitution is not offended when a police officer, based upon his "reasonable suspicion" that criminal activity is or may be occurring, stops a suspect for questioning. Such conduct, termed an "investigatory stop," does not violate the Ohio Constitution even though a police officer lacks probable cause to arrest the suspect. See *State v. Bobo* (1988), 37 Ohio St.3d 177, 524 N.E.2d 489; *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237; *State v. Freeman* (1980), 64 Ohio St.2d 291, 18 O.O.3d 472, 414 N.E.2d 1044; *State v.*

*Nealen* (1992), 84 Ohio App.3d 235, 616 N.E.2d 944;  *State v. Norwood* (1992), 83 Ohio App.3d 451, 615 N.E.2d 262.

In *Nealen, supra,* 84 Ohio App.3d at 239, 616 N.E.2d at 947, the court summarized the elements of the *Terry* holding as it pertains to the investigatory stop as follows:

"[A] police officer may stop and investigate unusual behavior, even without probable cause to arrest, *when he reasonably concludes that the individual is engaged in criminal activity.  In assessing that conclusion, the officer 'must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.'* * * * [C]ourts have concluded that *an objective and particularized suspicion that criminal activity was afoot must be based on the entire picture—a totality of the surrounding circumstances.*"  (Emphasis added.)

■ In the case *sub judice,* appellant does not deny he illegally parked a commercial vehicle in a fire lane at the Great Northern Mall in North Olmsted, Ohio.  He argues, rather, that illegally parking his vehicle in a fire lane did not justify a *Terry* stop by Officer Jandecka.  An investigatory stop in the case *sub judice* was unwarranted.  The parking violation had been completed before Medlar entered his vehicle, therefore, there was nothing for Jandecka to investigate.

In *State v. Gullett* (1992), 78 Ohio App.3d 138, 144, 604 N.E.2d 176, 180, the court stated in relevant part as follows:

"[W]e hold that except in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, *or that either the vehicle or an occupant is otherwise subject to seizure for violation of law,* stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."  (Emphasis added.)

In *State v. Whitsell* (1990), 69 Ohio App.3d 512, 523, 591 N.E.2d 265, 272, the court stated as follows:

" 'When a defendant alleges that an arrest was pretext to conduct an otherwise impermissible search, the appropriate inquiry is whether a *reasonable officer would have made the arrest absent an illegitimate motive to search.* * * *'

"Under this analysis, heavy emphasis is placed upon the *usual procedure* an officer employs in performing his duties.  If the officer *deviates from common practice in making the arrest,* the arrest is deemed a pretext and is invalid. * * * "  (Emphasis added.)  (Citations omitted.)

In the case *sub judice,* Officer Jandecka testified on direct examination at the suppression hearing as follows:

"Q. And, tell us, if you will, what, if anything, that you saw on that particular evening?

"A. Specifically, I was driving around the mall looking for fire lane violators. At this particular time, I had cited two (2), and I had found my way back to Entry Number 1 where I observed a large truck in the fire lane.

" * * *

"Q. Where was this truck parked?

"A. The truck was parked in front of P.J. McIntyres or Entry Number 1 in a fire lane.

"Q. After observing this vehicle parked there, what, if anything, did you do?

"A. Well, I—

"Q. Is that a loading or unloading area there at that particular entrance where the truck was parked?

"A. No, that's not a loading or unloading area.

"Q. Okay, go ahead.

"A. I proceeded to write the truck a fire lane violation.

" * * *

"Q. Tell us what occurred after writing the parking violation.

"A. *As is my practice* when I write up a fire lane violation, if I feel that the operator of the vehicle may be out shortly, and in this case, it being a truck, I suspected he would be or she would be, *I wait for the driver to come out.* An individual came out of entry Number 1 and went directly to the truck and got into the truck and started up and proceeded to drive away.

"Q. What did you do at this point?

"A. I had hit my—the police cruiser is equipped with an air horn, and I sounded the air horn. And, as the driver was getting into the truck, into the driver's door, I hit that area with the spotlight to alert the driver to the fact that the policeman parked behind him did want to have a conversation. The driver did not respond to those cues.

"Q. This is before the driver got into the vehicle?

"A. This is before the driver got into the vehicle.

"Q. Then, you indicated the driver did get into the vehicle and started forward moving?

"A.  That is correct.

"Q.  And, what did you do then, Officer?

"A.  I turned on the emergency lights and hit the air horn again with every intent to chase/follow it through the parking lot if need be.  The truck drove for 40 or 50 feet and stopped when apparently it became apparent that the cruiser was going to effect a traffic stop.

"Q.  The vehicle finally came to a stop, and what occurred after that?

"A.  The driver exited the vehicle and walked back to the driver's door of the police cruiser to talk to me.  He was identified by a driver's license.  I asked for his driver's license because I was writing the parking ticket and there is a place on there for driver information.  *The driver appeared—I made certain observations about the driver which eventually led me to perform a field sobriety test.*

"  *  *  *

"Q.  Now, is it a normal situation in a parking violation such as this to wait for the driver to come out?  Do you wait for the driver?

"A.  Yes, that is the normal course of business for traffic violations.  *It's something I specifically try to do oftentimes because the driver of the car is not the owner of the car, and there is a space allotted on the parking tickets for the driver's information.*

"Q.  So, you do this as a normal course of business for issuance of traffic violations in fire zones or no parking zones?

"A.  For parking violations, yes, I do."  (Emphasis added.)

From the foregoing discourse, it is evident Officer Jandecka was not able to "point to specific and articulable facts which, taken together with rational inferences from those facts," reasonably warranted an investigatory stop of Medlar.  *Nealen, supra,* quoting *Terry, supra,* 392 U.S. at 21, 88 S.Ct. at 1879, 20 L.Ed.2d at 905.  The officer demonstrated appellant parked his vehicle illegally in a fire lane, a violation which, by itself, does not ordinarily render "either the vehicle or an occupant * * * subject to seizure for violation of law.  * * *" *Gullett, supra.*

Ordinarily, parking citations are left with the vehicle on the windshield.  It is neither necessary nor requisite that the person issuing the parking citation see or record the information contained on the driver's license.  This was no chance encounter since Jandecka drove around the parking lot issuing other violations and returned in five or ten minutes to specifically give the parking citation to Medlar.  This was a personal mode of operation devised by Jandecka as evidenced by his testimony, *supra,* as follows:

"As is *my* practice * * *. *I* wait for the driver to come out. * * * It's something *I* specifically try to do. * * * " (Emphasis added.)

Jandecka's pretext for approaching the driver of a vehicle, *i.e.,* the parking citation requires the driver's information and the driver of a vehicle is often not the owner of the vehicle, hardly seems logical or reasonable since many vehicles are rented, leased, used by other members of the family or friends of the owner of the vehicle. To require Jandecka, in order to issue a parking citation, to wait for each driver to return so that he could record information from the driver's license would be ludicrous. This practice is neither required nor reasonable to issue a parking violation and constitutes an invasion of privacy and an unreasonable search and seizure pursuant to the Fourth Amendment to the United States Constitution as well as Article I of the Ohio Constitution.

After five or ten minutes, Jandecka returned but failed to notify Medlar he was the target of a police investigatory stop. Instead, Jandecka merely sounded an air horn and used a spotlight permitting Medlar time to enter his vehicle and drive away. The use of the air horn and spotlight could have been the work of some prankster. It is common knowledge air horns and spotlights are not exclusive equipment of the police. In fact, Jandecka's testimony reveals someone else in the parking lot was mimicking Jandecka's air horn that evening. Medlar had no way of knowing he was the target of a police stop without notification. It is obvious Medlar was not attempting to escape or evade the police by driving away since Medlar immediately stopped his vehicle and walked back to Jandecka's vehicle once the emergency lights on Jandecka's vehicle were activated.

Jandecka, by waiting until Medlar entered his vehicle and began driving, thereby escalated a simple parking violation, carrying a fine of seven dollars,[3] into a moving violation of DUI, a misdemeanor of the first degree with a possible maximum sentence of six months' incarceration and a fine of not more than one thousand dollars.[4]

---

**3.** N.Olmsted Cod.Ord. 353.07 provides for a waivable $7 fine for a parking violation.

**4.** R.C. 4511.99 states in relevant part as follows: "Whoever violates section 4511.19 of the Revised Code * * * shall be punished as provided in division (A)(1) * * * of this section.

"(A)(1) If, within five years of the offense, the offender has not been convicted of or pleaded guilty to any violation of section 4511.19 * * * the offender is guilty of a *misdemeanor of the first degree* and *the court* shall sentence the offender to a term of imprisonment of three consecutive days and *may sentence the offender pursuant to section 2929.21 of the Revised Code to a longer term of imprisonment. In addition, the court shall impose upon the offender a fine of not less than two hundred and not more than one thousand dollars."* (Emphasis added.)

R.C. 2929.21(A) states in relevant part as follows: "[W]hoever is convicted of or pleads guilty to a misdemeanor * * * *shall be imprisoned for a definite term or fined, or both.* * * *

"(B) *Terms of imprisonment for misdemeanor shall be imposed as follows:*

Based upon the foregoing facts, it is clear Jandecka deviated from common practice in making the stop, thus, the stop leading to the arrest is deemed a pretext and is invalid. *Whitsell, supra.* The "totality of the circumstances" does not demonstrate Medlar engaged in criminal activity except for the illegal parking for which the officer could or should have simply issued a citation and placed it on the windshield.

It seems Jandecka had an agenda of his own, using the parking violation as a ruse to approach the driver, search his person for evidence of intoxication, such as the smell of alcohol, bloodshot eyes, slurred speech, *etc.*, and seize his person to conduct a field sobriety and blood-alcohol test. Since Jandecka deviated from usual police procedure, we conclude Medlar's arrest was pretextual and, therefore, exceeded the bounds of *Terry, supra.* *Terry* deals with reasonable investigatory stops based upon articulable facts. In the case *sub judice* neither of these elements is present. The parking violation had been completed when Jandecka saw the truck parked in the fire lane. At this point Jandecka should have placed the citation on the vehicle. There was nothing further to investigate. The subsequent stop of Medlar's vehicle was a pretext since it was not based upon articulable facts, *e.g.*, erratic driving, etc. or other articulable facts. The pretextual search and seizure were definitely an invasion of privacy.

Assume, *arguendo,* the stop had been legal, which it was not, Officer Jandecka failed to "point to specific and articulable facts which, taken together with rational inferences from those facts," reasonably warranted the administration of a field sobriety and blood-alcohol test. *Nealen, supra.* At the suppression hearing, Jandecka stated he made "certain observations" which caused him to conduct the sobriety test but he failed to articulate specific facts with respect to these observations. In addition, Jandecka also failed to articulate specific facts, *e.g.*, speeding, erratic driving, *etc.*, to justify the stop of Medlar's vehicle which led to the subsequent administration of the sobriety and blood tests. Thus, Jandecka did not demonstrate the sobriety and blood tests were warranted based upon Medlar's driving and the "totality of the circumstances." *Nealen, supra.*

In sum, Jandecka's waiting for the driver of an illegally parked vehicle to return to issue a parking violation, permitting appellant to enter his vehicle and drive away, pursuing appellant under the pretext of issuing a parking violation without articulable facts demonstrating Medlar's driving was impaired, administering a sobriety test to appellant without being able to articulate specific facts justifying the stop, administering the sobriety test and then charging appellant

---

*"(1) For a misdemeanor of the first degree, not more than six months * * * (C) Fines for misdemeanor shall be imposed as follows: (1) For a misdemeanor of the first degree, not more than one thousand dollars. * * * "* (Emphasis added.)

with DUI is not only frowned upon but also a violation of the Fourth Amendment to the United States Constitution as well as Article I of the Ohio Constitution. The touchstone of these constitutional provisions is "reasonableness under the totality of the circumstances." The court in *Gullett, supra,* a much stronger case factually, stated as follows, 78 Ohio App.3d at 145, 604 N.E.2d at 180–181:

"The touchstone of the Fourth Amendment is reasonableness. Where a vehicle is driven on a roadway with no other traffic present, there was no speeding, erratic driving or other conduct, except for the edge line incident, to indicate that appellee was impaired, *the balance is in favor of the right to privacy and against the need for a stop.* Based upon the totality of the circumstances, we are not persuaded that sufficient articulable facts, and inferences therefrom, existed to constitutionally justify the stop." (Emphasis added.)

In the case *sub judice,* since the stop was neither investigatory nor supported by articulable facts, the field sobriety and blood tests were an invasion of Medlar's privacy and Jandecka's actions were unreasonable and violative of the aforementioned constitutional provisions. Based upon the foregoing analysis, the trial court erred when it overruled Medlar's motion to suppress. Clearly, the results of the field sobriety and blood tests constituted the "fruit of the poisonous tree," *i.e.,* the results were tainted by the constitutional violations and, therefore, were inadmissible. *Blanchester v. Hester* (1992), 81 Ohio App.3d 815, 612 N.E.2d 412; *State v. Denune* (1992), 82 Ohio App.3d 497, 612 N.E.2d 768. Medlar's sole assignment of error is, therefore, well taken and is sustained.

Judgment reversed.

Final judgment entered for appellant.

*Appellant discharged.*

HARPER, P.J., and NUGENT, J., concur.