THE STATE OF OHIO, APPELLANT, *v.* CHATTON, APPELLEE.

[Cite as State *v.* Chatton (1984), 11 Ohio St. 3d 59.]

(No. 83-645—Decided May 29, 1984.)

*Mr. John T. Corrigan,* prosecuting attorney, and *Mr. George J. Sadd,* for appellant.

*Mr. John M. Badalian* and *Mr. Alfred C. Grisanti,* for appellee.

*Per Curiam.* The issue in the case *sub judice* is whether the police officer, having detained appellee for a suspected traffic violation, continued to possess the authority to detain appellee for the purpose of determining the validity of appellee's driver's license once the officer no longer had reason to suspect that appellee was committing any traffic violation. While the issue is easily stated, its resolution presents a weighty problem involving implications which extend beyond the facts of the case at bar.

The parties concede at the outset that the police officer was justified in stopping appellee's vehicle since the vehicle displayed neither front nor rear license plates. R.C. 4503.21 requires that license plates with the appropriate validation sticker be displayed on the front and rear of all motor vehicles (with certain exceptions) and "shall be securely fastened so as not to swing." R.C. 4503.182(A) provides that the purchaser of a motor vehicle may be issued a "temporary license placard" which may be used "to legally operate the motor vehicle while proper title and license plate registration is being obtained." However, R.C. 4503.182 does not provide that these temporary license placards, commonly known as "temporary tags," must be displayed in any particular fashion. While it may be accepted practice to display temporary tags on the rear of the vehicle or in the rear windshield, there appears to be no mandatory requirement that they be visibly displayed at all. Indeed, the General Assembly may deem it advisable to provide for the display of temporary tags at some future date. Nevertheless, the statutory framework in place at the time of appellee's arrest, and in effect at this writing, does not call for the display of temporary tags. It follows that, as long as the operator of a motor vehicle without the standard front and rear metal license plates can produce a valid temporary tag, it cannot be said that the vehicle is being operated illegally or improperly.

The question necessarily becomes whether the police officer has continu-

ing justification to detain appellee and demand production of his driver's license once the police officer viewed the temporary tags lying on the rear deck of appellee's vehicle. We are compelled to respond in the negative.

It is firmly established that the detention of an individual by a law enforcement officer must, at the very least, be justified by "specific and articulable facts" indicating that the detention was reasonable. *Terry* v. *Ohio* (1968), 392 U.S. 1, 21-22 [44 O.O.2d 383]; *State* v. *Freeman* (1980), 64 Ohio St. 2d 291, 294 [18 O.O.3d 472]. In *Brown* v. *Texas* (1979), 443 U.S. 47, 51, Chief Justice Burger wrote for a unanimous court:

"* * * [T]he Fourth Amendment requires that a seizure must be based on specific, objective facts indicating that society's legitimate interests require the seizure of the particular individual, or that the seizure must be carried out pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers."

In *Brown* v. *Texas, supra,* the United States Supreme Court held that merely because an individual "looked suspicious" provided no justification to detain him and demand that he identify himself.

Furthermore, in *Delaware* v. *Prouse* (1979), 440 U.S. 648, the United States Supreme Court condemned the use of random stops of vehicles to check the validity of the operator's driver's license and the vehicle's registration. The court held at 663:

"* * * [E]xcept in those situations in which there is at least articulable and reasonable suspicion that a motorist is unlicensed or that an automobile is not registered, or that either the vehicle or an occupant is otherwise subject to seizure for violation of law, stopping an automobile and detaining the driver in order to check his driver's license and the registration of the automobile are unreasonable under the Fourth Amendment."

The inquiry herein must focus upon whether Grossmeyer, the police officer in this case, harbored an "articulable and reasonable suspicion" that appellee was violating the law at the time appellee was detained and ordered to produce his driver's license.[3] Grossmeyer testified that it was his belief that the law required temporary tags to be visibly displayed and that since appellee's temporary tag was not so displayed, Grossmeyer had a duty to investigate the identity of the operator of the vehicle to determine if he was the owner or had the owner's permission to operate the vehicle. Grossmeyer, an eleven-year veteran of the Maple Heights Police Department at the time of the suppression hearing, also testified that in his experience temporary tags were occasionally used to conceal the identity of stolen vehicles and were otherwise used illicitly.

The police officer's testimony must be viewed in the context of his

---

[3] We are not confronted in the present appeal with an issue relating to whether the evidence seized was in plain view, *Texas* v. *Brown* (1983), 75 L. Ed. 2d 502; *State* v. *Williams* (1978), 55 Ohio St. 2d 82 [9 O.O.3d 81], or whether the evidence was seized pursuant to a lawful inventory of the vehicle, *South Dakota* v. *Opperman* (1976), 428 U.S. 364; *State* v. *Robinson* (1979), 58 Ohio St. 2d 478 [12 O.O.3d 394].

mistaken belief that it was a violation of the law not to display temporary tags. The reality of the situation is that the police officer, absent reference to the failure on appellee's part to display his temporary tag, articulated no specific facts upon which a reasonable suspicion could be based that appellee was violating the law. If we were to uphold the detention of appellee to check the validity of his driver's license upon the generalized statement that temporary tags are sometimes used in criminal activity, we would be sanctioning, in effect, the detention of the driver of any vehicle bearing temporary tags. We are unwilling to place our imprimatur on searches of the citizens of this state and their vehicles simply because of the lawful and innocuous presence of temporary tags. The potential for abuse if such a rule were in effect, through arrogant and unnecessary displays of authority, cannot be ignored or discounted.

"* * * [T]o eliminate any requirement that an officer be able to explain the reasons for his actions signals an abandonment of effective judicial supervision of this kind of seizure and leaves police discretion utterly without limits. Some citizens will be subjected to this minor indignity while others — perhaps those with more expensive cars, or different bumper stickers, or different-colored skin — may escape it entirely." *Pennsylvania* v. *Mimms* (1977), 434 U.S. 106, 122, Stevens, J., dissenting.

The state relies heavily on *New York* v. *Belton* (1981), 453 U.S. 454, and *Michigan* v. *Long* (1983), 77 L. Ed. 2d 1201. In *Belton, supra,* the United States Supreme Court held that when an occupant of an automobile is subject to custodial arrest, the scope of the permissible search incident to the lawful arrest includes the passenger compartment of the vehicle as well as containers found therein. In *Long, supra,* the United States Supreme Court held that a *Terry* search could validly extend beyond the person of the individual detained to the passenger compartment of the vehicle. Neither of these cases addresses the question presented herein. Both *Belton* and *Long, supra,* simply relate to the scope of a search once the circumstances exist to conduct the search. The question presented in this appeal deals with whether, in the first instance, the circumstances justified appellee's detention to check the validity of his driver's license.

Perhaps the closest the United States Supreme Court has come to resolving the issue confronting this court today was in *Pennsylvania* v. *Mimms, supra.* There, an individual was stopped when police officers observed that his vehicle had an expired license plate. The individual was ordered out of his car. The officers noticed a bulge in the individual's jacket and proceeded to frisk him. A loaded handgun was discovered on his person, the gun was admitted as evidence, and the individual was convicted of carrying a concealed weapon. The Supreme Court upheld the validity of the search, holding that under *Terry,* the police officer could reasonably order the individual out of the car and conduct a limited search for weapons. See, also, *State* v. *Darrington* (1978), 54 Ohio St. 2d 321 [8 O.O.3d 318]. Nevertheless, the facts of the instant case are readily distinguishable. In *Mimms, supra,* the police of-

ficers continued to possess at least a reasonable suspicion *throughout the search* that the individual was driving an unregistered vehicle. By contrast, once the police officer herein observed the temporary tags, appellee could no longer be reasonably suspected of operating an unlicensed or unregistered vehicle. That characteristic immediately removes this appeal from the realm of *Mimms* or *Darrington, supra.*

In our view, because the police officer no longer maintained a reasonable suspicion that appellee's vehicle was not properly licensed or registered, to further detain appellee and demand that he produce his driver's license is akin to the random detentions struck down by the Supreme Court in *Delaware* v. *Prouse, supra.* Although the police officer, as a matter of courtesy, could have explained to appellee the reason he was initially detained, the police officer could not unite the search to this detention, and appellee should have been free to continue on his way without having to produce his driver's license. Cf. *United States* v. *Place* (1983), 77 L. Ed. 2d 110 (prolonged detention unreasonable under *Terry*).

Consequently, where a police officer stops a motor vehicle which displays neither front nor rear license plates, but upon approaching the stopped vehicle observes a temporary tag which is visible through the rear windshield, the driver of the vehicle may not be detained further to determine the validity of his driver's license absent some specific and articulable facts that the detention was reasonable. As a result, any evidence seized upon a subsequent search of the passenger compartment of the vehicle is inadmissible under the Fourth Amendment to the United States Constitution.

Accordingly, the judgment of the court of appeals is affirmed.[4]

*Judgment affirmed.*

CELEBREZZE, C.J., FORD, LOCHER, HOLMES, C. BROWN and J. P. CELEBREZZE, JJ., concur.

DAHLING, J., dissents.

FORD, J., of the Eleventh Appellate District, sitting for W. BROWN, J.

DAHLING, J., of the Eleventh Appellate District, sitting for SWEENEY, J.

---

[4] We acknowledge that in January of this year the United States Supreme Court heard arguments on whether to recognize a good faith exception to the Fourth Amendment exclusionary rule. *Massachusetts* v. *Sheppard* (1982), 387 Mass. 488, 441 N.E. 2d 725, certiorari granted (1983), 77 L. Ed. 2d 1386; *United States* v. *Leon* (C.A. 9, 1983), 701 F. 2d 187, certiorari granted (1983), 77 L. Ed. 2d 1386. It would appear that a mistaken belief on the part of a police officer that an individual's conduct is a violation of the law would not fall within such a good faith exception if adopted by the Supreme Court. Nonetheless, even should a good faith exception to the exclusionary rule be recognized for Fourth Amendment purposes, the question remains whether we would likewise recognize such an exception under Section 14, Article I of the Ohio Constitution.

DAHLING, J., dissenting. Officer D. M. Grossmeyer testified that the initial stop and detention of appellee's vehicle were predicated on the lack of observable *license plates*. After determining that appellee possessed a temporary tag, Grossmeyer inquired into the status of appellee's *driver's license*. A computer check of appellee's driver's license revealed that his driving privileges had been suspended. A computer recheck produced the same results.

At this point in the detention, probable cause existed for the arrest of appellee for no valid operator's license. As a consequence, the subsequent search of the passenger compartment of appellee's vehicle was within the guidelines of the Fourth Amendment. *New York* v. *Belton* (1981), 453 U.S. 454, states at page 460 that, "when a policeman has made a lawful custodial arrest of the occupant of an automobile, he may, as a contemporaneous incident of that arrest, search the passenger compartment of that automobile."

Grossmeyer testified:

"Q. And what was your reason for stopping this automobile?

"A. There was [*sic*] no plates on the front or rear, visible.

"Q. And as a result of seeing no plates on either the front or the rear, you pulled the car over?

"A. Yes, I did sir.

"Q. And what did you do at that point?

"A. I approached the car, and I observed a 30 day tag laying [*sic*] on the back of the back deck of the vehicle.

"Q. At what point were you able to see the 30 day tag he had?

"A. You had to walk right up on [*sic*] it. You couldn't see inside. Actually, you had to get out, walk up, and look in through the back window.

"Q. As a result of seeing a 30 day tag laying [*sic*] by the back window, what did you do?

"A. I requested registration information and identification from the driver. * * *

"* * *

"Q. And did he produce his driver's license?

"A. Yes, he did.

"Q. What if anything did you do with the driver's license?

"A. By that time I walked back to my police unit and requested information on the individual as far as driving record, the validity of his driver's license, and any record. * * *

"* * *

"A. It came back from the Bureau of Motor Vehicles that the individual in question had no driving privileges until I believe '82, September of '82. He was under suspension.

"Q. As a result of learning, or discovering this information, what did you do?

"A. I walked back up to the vehicle, requested that he step out of the car.

"I advised him he was being placed under arrest, because he didn't have a driver's license.

"I then told him to stand — he was searched against the side of the car, and at that point after I patted him down; he was up against the car, I looked inside the vehicle and by checking underneath the seat I found a loaded weapon.

"Q. What type of weapon?

"A. It was a .44 Special. I think it was a Charter Arms.

"Q. So it is your testimony that when you discovered that his license was under suspension that you decided to place him under arrest?

"A. Absolutely, sir.

"Q. And after you placed him under arrest, you patted him down?

"A. Right.

"Q. And after you patted him down you searched under, or where did you find the gun again?

"A. It was under the driver's seat. If you are sitting behind the seat, between your legs, on the floor, under the seat. It was in a leather holster. * * *"

Judge Burt Griffin, the trial judge below, fairly summarized the testimony as follows:

"So that the record may be clear, let me state the facts are that on February 19, 1981 that somewhere around 5:40 p.m. on Broadway Avenue in the City of Maple Heights, police officer Grossmeyer, of the Maple Heights Police Department saw a 1973 Oldsmobile proceeding in an opposite direction from him on Broadway, and he noticed that the front plate had no, that there were no front license plates [sic] visible.

"As the car passed him he turned to look at it, could not see any rear license plates [sic], so he did a U-turn, came up behind it, still could not see a rear license plate, and ordered the car stopped.

"When Officer Grossmeyer got out of his automobile and walked towards the car he got to the back of the car, he saw a thirty day tag lying horizontally on the back deck inside the back window of the automobile.

"This the officer believed was a violation of State requirements that a license plate, temporary license plate, like any license plate, must be visible.

"At that time, because in his experience, as he used it, temporary license plates can be misused, he decided to inquire further to ascertain whether this man was entitled to use the temporary license plate, and find out whether the driver was in fact the owner of the car, since it also was his experience that part of the misuse of temporary license plates is that they are used on cars that are either stolen, or used to commit crimes, so the police officer then asked the defendant for his driver's license.

"It is to be noted at this point there was in the automobile the defendant's nine year old daughter.

"The license plate was produced. The police officer checked it out by radio, back to his station, where then was made an entry in the computer

system that the State of Ohio provided, and it came back that, told via radio, that the computer had reported that the man was driving without driving privileges, that his driver's license had been suspended.

"At the request of the defendant he then checked again to see if this was still accurate, and a second check also produced proof that that license had been suspended, and in fact the license had been suspended at that time, although it subsequently developed that the State of Ohio conceded that they had improperly suspended his license.

"At that point, therefore, the officer concluded that he had to take the defendant into custody, and he patted him down for a search, and planned to transport him back to the police station.

"After the pat down search, the officer checked the automobile, searched the inside of the automobile, and where [sic] he found a gun under the driver's seat, in a holster under the front seat, driver's side of the automobile. * * *"

Apparently, the majority of this court feel that once the officer observed the temporary tag he should have let appellee go on his way. In my view, it was totally proper for the officer to ask for appellee's driver's license and to run a computer check.

I would hold that the trial court properly denied the motion to suppress and (after appellee's no contest plea) found appellee guilty. The judgment of the court of appeals discharging appellee should be reversed.