The STATE of Ohio, Appellee,

v.

VANDERHOFF, Appellant.*

[Cite as *State v. Vanderhoff* (1995), 106 Ohio App.3d 21.]

Court of Appeals of Ohio,
Eleventh District, Lake County.

No. 94–L–192.

Decided Aug. 21, 1995.

---

* Reporter's Note: A motion for a delayed appeal to the Supreme Court of Ohio was denied in (1995), 74 Ohio St.3d 1457, 656 N.E.2d 951.

**22**

*Charles E. Coulson,* Lake County Prosecuting Attorney, *Ariana E. Tarighati* and *Julie E. Mitrovich,* Assistant Prosecuting Attorneys, for appellee.

*R. Paul LaPlante,* Lake County Public Defender, and *Susan Grieshammer,* Assistant Public Defender, for appellant.

---

FORD, Presiding Judge.

Appellant, Thomas R. Vanderhoff, Jr., after a suppression hearing, changed his plea from "not guilty" to "no contest." The court found him guilty of carrying a concealed weapon. He was accorded a twelve-month sentence which was suspended. He was then placed on probation and ordered to serve one month in the county jail with work release privileges, to complete his G.E.D., and to perform one hundred eighty hours of community service.

On June 14, 1994, the Eastlake Police Department, at approximately 10:30 or 10:40 p.m., received a telephone call reporting that a "Pontiac Bonneville or similar vehicle with three males inside * * * had been sitting on the street with its lights off for an extended period of time. [The caller] thought that was suspicious and they saw fit to call the police." The area is a residential area, and parking is permitted on the street.

Officer Angelo who responded to the call arrived on the scene at 10:45 p.m., and he witnessed "a silver Pontiac, full-sized Pontiac, later determined to be a Parisianne, which is similar to a Bonneville, almost the same vehicle, and there were three people inside." The office pulled alongside the vehicle, "immediately opposite the driver's vehicle window of the vehicle." Upon inquiry, he was advised that they were waiting for Sara Hoso, the girlfriend of one of the passengers. The patrolman testified that he knew that Hoso's boyfriend, Earle Ballentine, had a number of outstanding felony warrants.

He moved his cruiser into a "strategically better location behind the vehicle," requested backup, and inquired as of the status of the warrants for Ballentine. He was advised that the warrants were still outstanding.

When the backup, which consisted of three additional police cruisers, arrived, Angelo approached the vehicle on the passenger's side and advised Ballentine to get out of the vehicle. Ballentine was arrested, subjected to a pat down search, handcuffed and escorted to the police officer's patrol vehicle.

The officer then returned to the Pontiac. He testified that he asked for permission to search the vehicle. Angelo stated that appellant granted him authority to do so. Appellant and the remaining passenger got out of the vehicle, and the search was undertaken. A gun was found under the driver's seat.

On cross-examination, the officer was asked whether he had any "outside support of any illegal conduct prior to approaching that vehicle," to which he responded that there was "[j]ust suspicious activity." He also noted that his previous testimony had been incorrect regarding the sequence of events leading to the discovery of the gun. He stated that his report, which he conceded would be more accurate than his memory, reflected that he had initially requested that appellant and the back seat passenger exit the vehicle, and then he asked for permission to search the automobile.

Appellant then testified. He noted that before Ballentine was arrested "[t]he officer asked me for my identification * * * a driver's license." He then stated that after Ballentine was arrested, the officer requested that he get out of the car. He complied with this request, and he was directed to the front of the vehicle, and the rear seat passenger was ordered to the back of the motorcar. He noted that the door to his vehicle was left open, and that at that time, there were a total of four police vehicles at the scene. When he was asked to consent to the search, he testified that he responded, "Do I have a choice?" He admitted that after a few more queries by the police to search the car, he consented as he felt he had no choice. He believed that the search was inevitable, regardless of his response.

On cross-examination, appellant was asked to read from a statement he had made at the police station. He noted that in the statement he wrote "I gave the okay for the police to search my car." This concluded his testimony and the hearing on the motion.

The court denied his motion to suppress. He subsequently changed his plea to no contest, was found guilty by the court, and was sentenced. It is from that entry which appellant presents the instant appeal, raising the following assignment of error:

"The trial court erred to the prejudice of the defendant-appellant when it overruled his motion to suppress."

Under the assignment of error presented by appellant, he advances two theories to support his proposition that the court should have granted his motion to suppress. Initially, he claims that the police lacked probable cause to "stop" appellant. He also claims that based upon the circumstances, the consent to search was not voluntarily given.

The issue of search and seizure was extensively discussed in *Terry v. Ohio* (1968), 392 U.S. 1, 20–21, 88 S.Ct. 1868, 1879, 20 L.Ed.2d 889, 905, where the court noted:

"[I]n determining whether the seizure and search were 'unreasonable' our inquiry is a dual one—whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place.

" * * *

"[F]or there is 'no ready test for determining reasonableness other than by balancing the need to search against the invasion which the search entails.'" (Citations omitted.)

In *State v. Ball* (1991), 72 Ohio App.3d 43, 46, 593 N.E.2d 431, 433–434, the court noted:

"In order to conduct a lawful investigatory stop, the investigating police officer must be able to point to specific and articulable facts which when taken together with rational inferences from those facts reasonably warrants the investigatory stop." (Citations omitted.)

▮ In this matter, the officer had specific facts which supported his decision to conduct a preliminary inquiry. The police department had received a call concerning "suspicious" activity, and the fact that a car was sitting in the street with its lights off for an extended period of time. When the officer arrived, the facts reported by the caller were correct.

Additionally, an officer is obligated to render assistance to disabled vehicles or stranded motorists. Here, the officer, in performing his duties, could have just as easily determined that appellant was in need of assistance. Therefore, a police officer, under the facts presented here, may inquire of the occupants of a vehicle so stopped and such a preliminary inquiry was not exceedingly onerous so as to be unreasonable.

▮ From this investigation, he learned additional facts upon which he was able to arrest the passenger. However, Ballentine's arrest is not at issue, as the question before this court is: Did the officer have specific and articulable facts

which justified the subsequent detention of appellant? We conclude that he did not.

As noted, after Ballentine was arrested, he was placed in one of the police vehicles. The police had already procured appellant's driver's license, and determined that he did not have any outstanding warrants. At that point in time, appellant should have been allowed to leave without any further questioning.

In *State v. Chatton* (1984), 11 Ohio St.3d 59, 11 OBR 250, 463 N.E.2d 1237, the Supreme Court of Ohio noted that "the detention of an individual by a law enforcement officer must, at the very least, be justified by 'specific and articulable facts' indicating that the detention was reasonable." (Citations omitted.) *Id.* at 61, 11 OBR at 251, 463 N.E.2d at 1239.

"In our view, because the police officer no longer maintained a reasonable suspicion [that violation upon which the stop had been predicated existed], to further detain appellee and demand that he produce his driver's license is akin to random detentions struck down by the Supreme Court in *Delaware v. Prouse* [ (1979), 440 U.S. 648, 99 S.Ct. 1391, 59 L.Ed.2d 660]." *Id.* at 63, 11 OBR at 253, 463 N.E.2d at 1240.

Nonetheless, the officer instructed appellant and the passenger to get out of the vehicle. Appellant "assumed the position" at the front of his vehicle, and the passenger was similarly situated at the back of the vehicle. The officer was standing in the open driver's side door. Appellant was not free to leave at this point in time, and the detention of appellant became custodial in nature, even though the officers did not have any basis upon which the restraint of appellant could be justified or which a search of the vehicle could be undertaken.

 Having determined that the detention was unlawful we must now determine whether appellant's "consent" to search the car cleansed the illegal police conduct. We conclude it did not.

In *Chatton*, the Supreme Court of Ohio directed that a gun discovered as a result of the unlawful search should be suppressed:

"[A]ny evidence seized upon a subsequent search of the passenger compartment of the vehicle is inadmissable under the Fourth Amendment to the United States Constitution." *Chatton*, 11 Ohio St.3d at 63, 11 OBR at 254, 463 N.E.2d at 1240.

In *State v. Retherford* (1994), 93 Ohio App.3d 586, 639 N.E.2d 498, the Second District Court of Appeals addressed a similar matter and arrived at the same result as we obtain in the instant action. In *Retherford,* the appellant was stopped for speeding. After she was issued the citation, her license was returned and she was advised that she was "free to go." However as she was leaving the

officer asked if she had any contraband, and whether she would consent to a search of the vehicle. Retherford permitted the search and illegal drugs were discovered. The court determined that the search was unlawful.

"Once a police officer has made a legitimate and constitutional stop of a vehicle, the driver and the vehicle may be detained only for as long as the officer continues to have a reasonable suspicion that there has been a violation of the law. * * * If, for example, after inspecting the vehicle, issuing a citation or talking with the driver, the police officer is satisfied that there has been no further unlawful activity, 'the driver must be permitted to continue on his or her way.' * * * In other words, an officer may not expand the investigative scope of the detention beyond that which is reasonably necessary to effectuate the purposes of the initial stop unless any new or expanded investigation is supported by a reasonable, articulable suspicion that some further criminal activity is afoot. * * *

"As we have previously stated, 'the mere fact that a police officer has an articulable and reasonable suspicion sufficient to stop a motor vehicle does not give that police officer "open season" to investigate matters not reasonably within the scope of his suspicion.' " (Citations omitted.) *Id.*, 93 Ohio App.3d at 600, 639 N.E.2d at 507–508.

The court concluded:

"Consequently, we need not inquire into whether Retherford's consent was truly voluntarily given 'in the spirit of apparent cooperation.' * * * We again hold, as we did in [*State v.*] *Pinder* [ (Dec. 15, 1993), Miami App. No. 93 CA 6, unreported, 1993 WL 518692], that a 'valid consent cannot be given following an illegal detention to which it is strongly connected, and that evidence uncovered as a result of such a search must be suppressed as fruit of the poisonous tree.' * * * " (Citations omitted.) *Id.* at 603, 639 N.E.2d at 509–510.

Similarly in this matter, we need not determine whether the search was consensual as it stemmed from an unlawful detention. Therefore, the gun should have been suppressed. *Chatton; Retherford.* Appellant's assignment is sustained, and the matter is reversed and judgment is entered for the appellant.

*Judgment reversed.*

BROGAN and WOLFF, JJ., concur.

JAMES A. BROGAN and WILLIAM H. WOLFF, Jr., JJ., of the Second Appellate District, sitting by assignment.