Appellant has presented one assignment of error for appeal that reads:
 "THE TRIAL COURT ERRED PREJUDICIALLY IN DENYING THE APPELLANT'S MOTION TO SUPPRESS, WHERE THE INITIAL STOP WAS MADE BECAUSE THE POLICE OFFICER DID NOT SEE A LICENSE PLATE, AND THE POLICE OFFICER HAD NO REASONABLE SUSPICION TO INVESTIGATE FURTHER AFTER FINDING A TEMPORARY LICENSE IN THE CAR'S REAR WINDOW."
As this court has previously stated:
 "An appellate court reviews whether substantial evidence supports a trial court's decision on a motion to suppress. Maumee v. Johnson (1993), 90 Ohio App.3d 169, 171. The trial court acts as the trier of fact and is in the best position to resolve questions of fact and determine witness credibility. State v. Johnston (1993), 85 Ohio App.3d 475, 477. Consequently, an appellate court must accept the trial court's findings of fact if they are supported by competent, credible evidence. State v. Guysinger (1993), 86 Ohio App.3d 592, 594." State v. Jenkins (Mar. 31, 1998), Lucas App. No. L-97-1303, unreported.
At the same time, this court will independently decide questions of law. State v. Vorous (Feb. 22, 1994), Stark App. No. CA-9414, unreported. Keeping this standard of review in mind, we now consider the arguments presented by the parties and the record in this case.
The record shows that on September 4, 1997, appellant was charged in the Maumee Municipal Court with violating R.C.4511.19(A) (1) and R.C. 4511.19(A) (3). On December 17, 1997, he filed a motion to suppress all evidence discovered by his arresting officer following the initial stop of appellant in his pickup truck. Appellant argued that the officer lacked reasonable, articulable suspicion for the stop. He said, therefore, that the stop and all that followed violated the Fourth
and Fourteenth Amendments to the United States Constitution.
On December 23, 1997, the trial court held a hearing on the motion to suppress. The arresting officer, a state trooper, was the only witness called. The officer testified that shortly after one a.m. on September 2, 1997, he saw appellant driving a pickup truck on State Route 2. The officer said: "I did not observe a plate on the front of the vehicle and as I glanced in the rear-view mirror as it went by, I didn't see a plate on the back either." He turned his cruiser around and stopped appellant.
The following exchange occurred at the hearing regarding the events that happened right after the stop.
 "Q. Now, as you approached his vehicle, from the rear, as you were catching up to his vehicle, from the rear, did you observe if there was a license plate light on that vehicle?
 "A. The rear bumper has an indentation for a license plate. I did not see a license plate or a light to illuminate the plate if it was there.
"Q. Was the vehicle equipped with any tail lights?
"A. Yes, it had tail lights.
 "Q. And based upon your observation of those tail lights, did those tail lights light up, independently, the license plate area of the vehicle?
"A. No, they did not.
"Q. Now, as you stopped the vehicle, what happened?
 "A. I approached the vehicle as I came along side the driver's side, I did observe, taped in the back window on the passenger's side, a temporary tag."
The officer testified that the temporary tag was on the inside of a lightly tinted window. He said: "It wasn't obvious to me. I did not actually see the temporary tag until I was along side — walked alongside the vehicle." He testified that when he saw the temporary tag in the back window, "it was not illuminated." He said that when he was at the rear of the truck he could see "that it was an Ohio temporary tag."
He was asked: "After noting it was an Ohio temporary tag, what did you do next?" He answered:
 "I was at the rear of the driver's door. I spoke to the driver about the tag, asked him for the registration to check the ownership of the tag on this vehicle, and asked for a driver's license and proof of insurance."
When asked to explain why he asked for those documents, he said:
 "To make sure that that vehicle, that temporary tag, belonged to that vehicle and my intention was to give the driver a vehicle notice that the plate was improperly displayed, because it was not visible to me from the rear of the vehicle."
The prosecutor asked the officer why he believed the tag was not properly visible to him from the rear of the truck. The officer answered:
 "Because of the windows being slightly tinted and the way the lights reflected off of them, I did not see the temporary tag until I was actually out of the patrol car and up next to the vehicle."
The officer admitted that when he stopped appellant, it was dark outside. After checking, he learned that the temporary tag was valid.
On cross-examination, the officer admitted that the temporary tag was displayed in the rear window of appellant's pickup truck. Appellant's counsel asked:
 "And there is nothing blocking the view of that, is there? There is no camper, rear or anything like that on this vehicle, was there?"
The officer answered:
 "Because the window was slightly tinted and it was dark, you could consider that a blockage. I could not see the temporary tag easily."
The officer admitted, however, that he did see the temporary tag before he spoke with appellant.
On redirect examination, the prosecutor asked the officer: "And after you made the determination that everything was proper, why did you not cease your investigation at that time?" He answered:
 "Because I smelled a strong odor of an alcoholic beverage about Mr. Baumgartner. His eyes were bloodshot and glassy and I wanted to make a determination if he was able or not able to drive."
Appellant's counsel then asked:
 "Officer, you determined this well after you had already observed the temporary tag in the rear window of this vehicle, isn't that correct?"
The officer answered:
 "yes. [sic] After I observed the temporary tag and made the initial contact, I continued that investigation (inaudible)."
The trial court denied the motion to suppress. In an opinion filed on July 2, 1998 the trial court made the factual findings that the officer saw the temporary tag displayed on the back window of the passenger compartment of appellant's pickup truck as he approached appellant's truck and that the officer asked appellant for a driver's license and registration. The court said: "From his conversation with the defendant, indicia of intoxication were observed and the defendant was ultimately charged with the offense of driving under the influence of alcohol."
The trial court noted that a Supreme Court of Ohio opinion is reported in which the court considered a similar fact pattern, State v. Chatton (1984), 11 Ohio St.3d 59. The trial court then said the facts in this case are distinguishable from the facts in Chatton. The court said:
 "A narrow reading and application of Chatton would mandate that at the moment the officer at bar viewed the temporary tag in the rear window he was Constitutionally compelled to freeze in his footsteps and back immediately to his car and leave the scene without saying word one to the Defendant. In the real world, however, the absurdity of this is apparent. The person stopped and then abandoned by the law officer in this fashion would utterly be at a loss as to whether he should leave or remain at the scene pending some other action by the officer.
 "Viewing the facts at bar from a common sense vantage, it is this Court's belief that the officer was allowed to speak with the driver of the vehicle after a good faith stop was made without violating the Fourth Amendment rights of the defendant. c.f. United States v. Leon, 468 U.S. 897(1984).
 "It was during the discussion after the stop of the Defendant that the officer at bar witnessed the indicia of intoxication that led to the ultimate arrest of the defendant on the charge of driving under the influence. Since it was not violative of Defendant's rights to speak with the Defendant after the officer had initiated a good faith stop, the fact that the officer had asked to view the defendant's license is irrelevant to the charge of driving under the influence. Accordingly, Defendant's motion to suppress is found not well taken."
Appellant begins his argument in support of his assignment of error by noting that the state had the burden to prove that the officer had reasonable suspicion of illegal activity to support the investigatory stop of appellant. He argues that the state further had the burden to prove that any search and seizure was based upon probable cause. Appellant says that in this case, the facts show that the officer's reasonable suspicion of criminal activity was proved false after the initial stop, and the basis for the investigatory stop ended at the moment the officer saw the temporary tag in the back window of appellant's pickup truck.
Appellant does not disagree with the trial court's conclusion that the officer in this case was not required to turn around immediately after seeing the temporary tag in the back window of appellant's vehicle and leave without speaking to appellant. Appellant acknowledges that the officer could still approach him to explain why the officer initially made the stop and to say that he now saw appellant did have a temporary tag. Appellant argues, however, that the officer's right to briefly approach him to explain cannot be expanded to permit the officer to demand appellant's license and registration. He points out that this is especially important in this case because the officer never testified that he observed any indicia of intoxication when he first approached appellant. He says the officer's reference to "observing indicia of intoxication was following the examination of documents." (Emphasis sic). He argues: "The testimony suggests that had the officer simply informed Appellant of the mistake, without the additional observation and conversation attendant to Appellant producing, and the officer examining, Appellant's papers, the officer would have had no suspicion of Appellant's alleged intoxication." He concludes that because the state had the burden of proof, the state had to show the officer's observation of indicia of intoxication happened upon his initial contact with appellant, and not after he examined appellant's license and registration.
Finally, appellant argues that it was not illegal for him to have the windows in his pickup truck slightly tinted. He says that the state did not present evidence to show that the tinting on his vehicle windows did not meet legal requirements in Ohio, and that without that evidence, the assumption must be that the temporary tag was legally displayed. He adds: "Because the State produced no testimony even remotely suggesting that, thus measured, the tag was illegally displayed, all reasonable suspicion had evaporated, as a matter of law, when the officer saw the tag in the rear window."
Appellee responds that the initial stop was based upon reasonable suspicion of illegal activity. Appellee argues that it was appropriate for the officer to approach appellant to explain the reason for the stop even after the officer saw the temporary tag displayed in the back window of appellant's pickup truck. Appellee says: "Clearly, the plain view observation (odor of alcohol and glassy eyes) by Trooper Coll while informingAppellant of the reason for the stop, provided additional reasonable suspicion to warrant further detention and investigation." (Emphasis added).
Appellee also argues that the officer could detain appellant for a separate violation of failing to have tail lights and license plates installed to illuminate a license plate, a violation of R.C. 4513.05. Appellee says the officer could detain appellant because of this "equipment defect". Finally, appellee argues that the officer acted in good faith and that the brief stop and detention of appellant in this case was reasonable.
Appellee is clearly presenting two alternative arguments on appeal to support the concept that the officer in this case was justified in detaining appellant and conducting an investigation. The first argument is that the initial stop of appellant was justified because the officer could not see any license plates displayed on appellant's vehicle. According to appellee, the officer could proceed to the window of appellant's pickup truck to tell appellant the reason for the stop even after the officer saw the temporary license tag in appellant's rear window. Appellee then asserts that the officer immediately noticed the indicia that appellant was under the influence of alcohol when the officer spoke to appellant to tell him the reason for the stop and before the officer asked appellant for a license and registration.
The first argument presented by appellee is the one the trial court considered dispositive. The trial court ruled that the initial stop was constitutionally sound. The trial court ruled as a matter of law that the officer was free to continue approaching appellant's vehicle even after the officer saw the temporary license tag in the back window of appellant's pickup truck. The trial court concluded that because the officer could talk with appellant to explain the initial reason for the stop the officer's request for appellant's license and registration were "irrelevant to the charge of driving under the influence." Finally, the trial court made a finding of fact that: "It was during the discussion after the stop of the Defendant that the officer at bar witnessed the indicia of intoxication that led to the ultimate arrest of the defendant on the charge of driving under the influence." For the following reasons, we do not reach the same legal conclusions as the trial court on the first issue argued by the parties on appeal.
We agree with the trial court that State v. Chatton does not have to be read so narrowly that a police officer who stops a vehicle because he cannot see a license plate displayed, but who sees a temporary tag on his way to talk to the driver of the vehicle, must stop, turn around, return to his cruiser and drive away, leaving the driver who was stopped in bewilderment. Indeed, the Supreme Court of Ohio indicated in State v. Chatton that a police officer "as a matter of courtesy, could have explained to appellee the reason he was initially detained * * *." State v.Chatton, 11 Ohio St.3d 59, 63.
However, the Supreme Court also indicated that the brief detention of the driver to make a courtesy explanation could not be connected to a continued detention and search, and the driver "should have been free to continue on his way without having to produce his driver's license." Id. at 63. Therefore, we do not agree with the trial court's conclusion that it was "irrelevant" that the officer in this case asked appellant for his license and registration.
This conclusion is further strengthened by the reality that the state has the burden to show that the officer noticed indicia that appellant was under the influence of alcohol during the courtesy explanation of the stop. If the officer noticed the indicia of appellant being under the influence of alcohol immediately, he would have new, articulable, reasonable suspicion that appellant was committing a crime that would justify the continued detention and investigation of appellant. See, State v.Robinette (1997), 80 Ohio St.3d 234, paragraph one of the syllabus; State v. Chatton, 11 Ohio St.3d at 63.
The trial court's finding of fact on this point is not definite regarding the time that the officer first noticed the indicia that appellant was under the influence of alcohol. The trial court found: "It was during the discussion after the stop of the Defendant that the officer at bar witnessed the indicia of intoxication that led to the ultimate arrest of the defendant on the charge of driving under the influence." The only testimony in the record from the officer regarding when he noticed indicia of intoxication is the short exchanges from redirect and recross that follow:
 "Q. * * * And after you made the determination that everything was proper, why did you not cease your investigation at that time?"
 "A. Because I smelled a strong odor of an alcoholic beverage about Mr. Baumgartner. His eyes were bloodshot and glassy and I wanted to make a determination if he was able or not able to drive."
" * * *
 "Q. Officer, you determined this well after you had already observed the temporary tag in the rear window of this vehicle, isn't that correct?"
 "A. yes. [sic] After I observed the temporary tag and made the initial contact, I continued that investigation (inaudible)."
The officer's testimony does not establish that he smelled the strong odor of alcoholic beverage about appellant or that he noticed appellant's eyes were bloodshot and glassy before he asked appellant for a license and registration. Accordingly, the state did not meet its burden to show that the officer formed reasonable, articulable suspicion that appellant was under the influence of alcohol during the legally permissible detention to give appellant a courtesy explanation regarding the reason for the initial stop. Absent some other basis to justify the continued detention of appellant to conduct an investigation, the motion to suppress should be granted.
However, the parties have briefed and argued a second argument on appeal that was not addressed by the trial court.[1] The second argument relates to the issue of whether the officer discovered new facts after he stopped appellant that formed an independent justification for detaining appellant. Specifically, did the officer discover an "equipment defect" for which he could detain appellant?
As can be seen from the testimony we previously quoted from the record, the officer testified that as he approached appellant's pickup truck he noticed two things. First, he noticed that there was no light to illuminate the indented area in appellant's truck bumper where a license plate would ordinarily be placed, and appellant's taillights were not bright enough to light the area. Second, he noticed appellant did have a temporary tag displayed in the rear window of his truck. He said he could not see the temporary tag because of the light tinting in the rear window of appellant's pickup truck and because of the dark of the early morning hours. The officer testified that he intended to give appellant a defect notice that the temporary tag was improperly displayed because it was not visible to him from the rear of the vehicle.
R.C. 4503.21 contains the provisions that specify the requirements for display of a temporary tag. It states, in pertinent part:
 "No person to whom a temporary license placard or windshield sticker has been issued for the use of a motor vehicle under section 4503.182 [4503.18.2] of the Revised Code, and no operator of that motor vehicle, shall fail to display the temporary license placard in plain view from the rear of the vehicle either in the rear window or on an external rear surface of the motor vehicle, or fail to display the windshield sticker in plain view on the rear window of the motor vehicle. No temporary license placard or windshield sticker shall be covered by any material that obstructs its visibility."
In this case, the officer admitted that appellant did display his temporary tag in the rear window of his pickup truck. The officer argued, however, that he believed the temporary tag was obstructed by a combination of the lightly tinted window in appellant's pickup truck and the dark of the early morning hours.
The provisions that govern the amount of tinting that is allowed on windows of vehicles operated on roadways in Ohio are found in R.C. 4513.241 and in Ohio Administrative Code section4501-41-03. R.C. 4513.241 provides, in pertinent part:
 "(C) No person shall operate, on any highway or other public or private property open to the public for vehicular travel or parking, lease, or rent any motor vehicle that is registered in this state unless the motor vehicle conforms to the requirements of this section and of any applicable rule adopted under this section."
Ohio Administrative Code section 4501-41-03 provides, in pertinent part:
 "(A) No person shall operate, on any highway or other public or private property open to the public for vehicular travel or parking, lease, or rent any motor vehicle that is required to be registered in this state with any sunscreening material, or other product or material which has the effect of making the windshield or windows nontransparent or would alter the windows' color, increase its reflectivity, or reduce its light transmittance, except as herein specified:
"* * *
 "(3) Any motor vehicle with sunscreening material applied to the side windows near the driver and passenger in the front of the car and/or the rear windows so long as such material, when used in conjunction with the safety glazing materials of such windows, has a light transmittance of not less than fifty per cent plus or minus three per cent and is not red or yellow in color."
We agree with appellant that the state had the burden to prove that appellant's window tinting was in violation of the above quoted statutory provisions and administrative regulations. We also agree with appellant that the state did not meet that burden of proof in this case. The officer testified that appellant's rear window was "lightly tinted." Nothing in that description establishes that the tinting was an improper color or that it was too dark to comply with light transmittance requirements.
We further agree with appellant that none of the statutory provisions relating to the display of a temporary tag makes him responsible to light the area where the tag is displayed so that it will not be obstructed from view during the dark hours of the night and early morning. Accordingly, even though the officer intended to advise appellant of an equipment failure for an improperly displayed temporary tag, he did not have a reasonable, articulable suspicion that appellant was engaged in criminal activity; therefore, he had no constitutional justification for the continued detention of appellant. See Cityof Willoughby v. Vilk (Sept. 30, 1997), Lake App. No. 96-L-141, unreported; State v. Newell (Dec. 20, 1995), Hamilton App. No. C-950302, unreported.
Appellee's second argument to support the concept that the officer in this case was justified in detaining appellant and conducting an investigation is that the officer formed an independent basis for an articulable, reasonable suspicion that appellant was violating the law when the officer saw that appellant did not have tail lights or a separate light installed to illuminate a license plate when the license plate was installed in the indented area of the bumper, a violation of R.C. 4513.05. Appellee says the officer could detain appellant because of this "equipment defect".
We reject this argument for the following reason: We believe that the provisions of R.C. 4513.05 are only applicable when a permanent license plate is required to be in place. R.C.4513.05 provides:
 "Every motor vehicle, trackless trolley, trailer, semitrailer, pole trailer, or vehicle which is being drawn at the end of a train of vehicles shall be equipped with at least one tail light mounted on the rear which, when lighted, shall emit a red light visible from a distance of five hundred feet to the rear, provided that in the case of a train of vehicles only the tail light on the rearmost vehicle need be visible from the distance specified.
 "Either a tail light or a separate light shall be so constructed and placed as to illuminate with a white light the rear registration plate, when such registration plate is required, and render it legible from a distance of fifty feet to the rear. Any tail light, together with any separate light for illuminating the rear registration plate, shall be so wired as to be lighted whenever the headlights or auxiliary driving lights are lighted, except where separate lighting systems are provided for trailers for the purpose of illuminating such registration plate." R.C. 4513.05
(Emphasis added).
In this case, registration plates were not yet required because appellant could still display a temporary tag pursuant to R.C. 4503.21. Accordingly, the prosecutor's second argument is not persuasive because the provisions of R.C. 4513.05 did not apply in this case and could not serve as a basis to justify the continued detention of appellant after the officer gave a courtesy explanation of his reason for initially stopping appellant.
Appellant's sole assignment of error is well-taken. The judgment of the trial court is reversed, and this case is remanded for further proceedings consistent with this opinion.
Costs to appellee.
JUDGMENT REVERSED.
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
 ________________________________ Peter M. Handwork, P.J.
JUDGE _______________________________ Richard W. Knepper, J.
JUDGE _________________________________ Mark L. Pietrykowski, J.
JUDGE
CONCUR.
[1] While this court generally would not act as a trier of fact on an appeal from a ruling on a motion to suppress, precedent does exist for an appellate court to consider an issue arising from a motion to suppress that was not addressed by the trial court when certain conditions are met. Those conditions include: no request from the parties in the trial court for findings of fact, a waiver on appeal of any objection to the trial court's failure to make adequate findings of fact, State v.Almalik (1987), 41 Ohio App.3d 101, 104, and a record with sufficient evidence to demonstrate "that the trial court's decision was legally justified and supported by the record." Statev. Brown (1992), 64 Ohio St.3d 476, at the syllabus; see, also,State v. Azcona (Mar. 6, 1998), Athens App. No. 97 CA 21, unreported. Because those conditions are met in this case, we will consider the second issue argued by the parties even though the trial court did not reach the issue in its opinion.