OPINION
Leszek P. Byczkowski was charged with speeding, a seat belt violation, and possession of a small amount of marijuana. After the trial court overruled his motion to suppress evidence, the charges were disposed of on no contest pleas, followed by guilty findings and the imposition of fines and costs. On appeal, Byczkowski advances the following assignment of error:
 IT WAS "UNREASONABLE" UNDER THE FOURTH AMENDMENT FOR THE OFFICER TO DETAIN APPELLANT BEYOND THE PURPOSES OF THE ORIGINAL STOP BECAUSE THE OFFICER LACKED A REASONABLE SUSPICION TO BELIEVE THAT APPELLANT WAS INVOLVED IN DRUG ACTIVITY; THUS THE TRIAL COURT ERRED WHEN IT OVERRULED THE SUPPRESSION MOTION.
We agree and, accordingly, we will reverse.
The motion to suppress attacked both the police stop of Byczkowski's car and the subsequent warrantless search of the car that produced the marijuana. The legality of the search of the car is the only issue before this court. The trial court's decision and judgment entry contain an ample discussion of the background facts and its rationale for overruling the motion to suppress. We will supplement the statement of facts in our discussion of the assignment of error. The trial court wrote as follows:
 The facts of the case are as follows. On November 5, 2000, Trooper Kovach observed the defendant driving a vehicle which he visually estimated to be traveling at a speed in excess of the posted speed limit and confirmed that observation with a reading from his properly calibrated radar unit. Upon stopping defendant for the speeding violation the trooper noted that the defendant was much more nervous than a reasonable person would be for a speeding stop. Defendant's speech was choppy and fragmented to the extent that he had trouble forming words. When the defendant responded to Trooper Kovach's request to produce the vehicle's registration the defendant reached into his glove box in a manner that awkwardly positioned his body to shield the trooper's view of the glove box. Up to that point the defendant avoided eye contact with Trooper Kovach. However, during the defendant's reach for the glove box he then looked directly at the trooper in a manner that gave the appearance that the defendant was checking to see if the trooper could view the glove box. After the defendant got his registration from the glove box his speech pattern improved. The trooper saw books on the rear seat of defendant's vehicle but noticed an apparently empty book bag on the back floor.
 Trooper Kovach testified that the suspicious circumstances surrounding his contact with the defendant caused him to believe that the defendant might have contraband in his car. Due to his suspicions, when Trooper Kovach returned to his patrol car to write a citation he requested his dispatcher to call for a canine drug unit to assist. At the same time he placed the call to the dispatcher he confirmed that the defendant had a valid operator's license, valid registration, and no wants or warrants. This call took approximately three minutes to complete. The officer then prepared citations for a speeding violation, cited as a fourth degree misdemeanor due to defendant's prior speeding conviction with the last 12 months, and for a minor misdemeanor seatbelt violation. The trooper completed his paperwork. It was an additional 10 minutes before the canine unit appeared on the scene.
 During the 10 minutes from the completion of the traffic paperwork until the drug dog appeared on the scene defendant was told that he was being held under an investigative detention. According to the trooper the defendant sat quietly and waited during that period of time.
 As soon as Officer Ray from the Fairborn Police Department arrived with the drug dog the vehicle was prepared for the search, which took approximately one minute. The dog started at the left rear bumper of the vehicle and "hit" four times for drugs. The trooper then patted down the defendant and found more than $16,000 on his person. Defendant's vehicle was then searched and a bag with approximately two-tenths of a gram of marijuana was found in the trunk and another one-one thousandths of a gram of marijuana residue was found on the floor of the back seat. The more than $16,000.00 was seized and turned over to the DEA.
* * *
 It should be pointed out that it is well-established that a drug dog sniff does not constitute a search. United States vs. Place (1983), 462 U.S. 696, 103 S.Ct. 2637, 77 L.Ed.2d 110. Accordingly, an officer need not have a reasonable suspicion that a vehicle contained contraband to conduct a dog sniff of the vehicle. However, there being a 10 minutes gap between the completion of the citations and the arrival of the canine unit, the Court must address the issue of whether or not that period constituted a lawful detention of the defendant. Trooper Kovach testified that he told the defendant he was under investigative detention during this time but he was not under arrest and he was not handcuffed. However, defendant never consented to this detention.
 The Ohio Supreme Court in State v. Chatton (1984), 11 Ohio St.3d 59 held that the duration of an initial stop may not last longer than is necessary to resolve the issue that led to the original stop absent some specific and articulable facts that the detention was reasonable. The Robinette trilogy attempted to clarify this issue. The Court in State v. Robinette (1997), 80 Ohio St.3d 234, 685 N.E.2d 762, found that when a police officer's objective justification to continue detention of a person stopped for a traffic violation for the purpose of searching the person's vehicle is not related to the purpose of the original stop, and when that continued detention is not based on any articulable facts giving rise to a suspicion of some illegal detention, the continued detention constitutes an illegal seizure.
 The Second District Court of Appeals in State vs. Kerns (March 16, 2001), Montgomery App. No. 18439, unreported, affirmed the judgment of the trial court in overruling defendant's motion to suppress. The Court's decision turned on the state's "fallback argument" that at the time the drug sniffing dog was requested the officers already had a reasonable articulable suspicion that drugs were in the car.
 The Court in the case sub judicia finds that based upon his observations and his experience Trooper Kovach had a reasonable articulable suspicion that contraband was in the defendant's car which permitted him to detain the defendant only for that length of time reasonably necessary to secure the presence of the drug sniffing dog to confirm or dispel his suspicion. Without such suspicion, the detention would not have been lawful. The trooper imposed a restraint that was both limited and tailored reasonably to secure law enforcement needs while protecting privacy interests. Applying Kerns, the record in this case supports a determination that once Trooper Kovach reasonably suspected defendant's car contained drugs he acted with reasonable dispatch to confirm or dispel his suspicions and that the 10 minute length of his detention of defendant was within constitutional limits. The Court therefore finds that the search of defendants's vehicle following the dog sniff and "hits" was lawful. The discovery of marijuana residue gave the trooper probable cause to arrest defendant.
The trial court correctly identified the dispositive issue: whether Trooper Kovach possessed a reasonable articulable suspicion that contraband was in Byczkowski's car so as to justify the ten minute detention after completing the paperwork on the traffic violations.
We conclude on the facts of this case that Trooper Kovach did not possess the requisite reasonable articulable suspicion that the car contained contraband. See Ornelas v. United States (1996), 517 U.S. 690
for our standard of review.
Trooper Kovach expressed his suspicions upon observing Byczkowski and his car as follows:
 Q. Have you had any specific experience or training regarding narcotics or drug trafficking?
 A. We did have a class on drug interdiction, what is known in the Highway Patrol as a TDIT class, traffic drug interdiction training. That was while I was at the academy for six months.
Q. Okay. What was covered in that course?
 A. What was covered in that course were certain indicators as far as things that we should look for, things that don't add up, things that don't make sense, movements or excessive nervousness by a driver.
Q. These are indicators that a person may have —
 A. May have drugs or other contraband, weapons, or something like that.
* * *
Q. What happened next:
 A. At that time, I approached him to inform him of the reason for the stop. At this point, he seemed more nervous than most individuals who are stopped. There is some nervousness to be expected when approached by a police officer; however, his was more of a choppy, fragmented speech where he was not able to complete sentences or form words a lot of times. When I asked him for his registration, he reached over — he had not made eye contact with me at this point either. When I asked him for the registration, he bladed his body as to block my view from the glove compartment, reaching behind him without looking in the glove compartment but keeping his eyes on me. He grabbed what he needed from the glove compartment and shut it immediately.
 Q. Would you tell the Court where the glove compartment is located?
 A. In the vehicle — it is a Cadillac so it is a pretty wide vehicle. It's located, I would say, more than his arm length because he did have to stretch over, like this, in order to get to at least the knob (indicating).
Q. Were you able to see the glove compartment?
 A. I was not able to see it because of his blocking my view.
 Q. What, if anything, about the actions of the Defendant at that time, based on your experience —
A. Based on my training —
Q. Hang on. — were suspicious in any way?
 A. Based on my training and experience, most people actually look into the glove box to see what they are looking for or turn their whole body as to go for the glove box. Because he didn't make eye contact with me, because of his excessive nervousness, I thought that it could be something more, more to the stop than just a Speed and Seat Belt.
Q. Did you have any specific thought of what that was?
 A. Not at that time. At that time, I did observe in his back seat books laying on the seat and a book bag laying on the floor as well as a book bag filled with books on the front seat.
Q. What about that, if anything, was suspicious?
 A. If I were to take books out of a book bag once I got it into the car, it would more than likely be the front seat than the back seat, because I would more than likely access the ones next to me. If I was to put my book bag in the back, I wouldn't want to unload my books, leave my book bag sit there, so when I had to get out I would have to load my book bags up. A reasonably prudent person doesn't seem like they would do that.
 Q. Aside from these things appearing odd, is there anything based on your specific training or experience that led you to believe they were suspicious of anything in particular?
 A. Not necessarily anything in particular. But, at that time I would have to say, I had had a case a few months earlier where a Defendant was acting similarly, and it ended up having drugs on their person.
* * *
 Q. In this case, specifically, what didn't make sense to you was the books in the back seat out of the book bag?
 A. The books in the back seat out of the book bag and why he wouldn't want me to see in his glove compartment, those 2 things.
 Q. The book bag, then, bothered you because the books were out of the book bag?
 A. They were on top of the seat and the book bag was on the floor.
 Q. Could you determine from looking in if it appeared something was in that book bag?
A. No, I could not.
 Q. I didn't ask the question well. Is it your testimony that when you looked at the book bag, you believed it to be empty, or you just couldn't tell at all whether it had anything in it?
A. I (sic) appeared to be empty, but I couldn't tell.
Q. So it did not appear to you there was a weapon in it?
 A. Weapons are small and hard to find, so it could have been a weapon. It may not have been a weapon.
 Q. You testified, Trooper, that it appeared to be empty. Is that still your testimony?
A. I said it appeared to be empty, but I couldn't tell.
Q. So you don't know whether it was or not?
A. Right.
 Q. But it troubled you because the way you know reasonable, prudent people, was your quote?
A. Yes.
Q. They wouldn't have books on the top of the book bag?
 A. They weren't on top of the book bag, sir. The book bag was on the floor. The book (sic) were in the seat. If there was room in the book bag, why not have the books in the bag, I guess is why it bothered me.
 Q. Did you determine from that observation that that was an indicator from your training that drugs might be in his car?
A. No.
 Q. Now, let's go to the other incident. You talked about the glove box was a problem for you.
A. Yes, sir.
 Q. And it is your testimony that because — and let me help you. I can't pronounce his name either. He goes by Pete. You know that?
A. Yes, sir.
 Q. Let's call him Pete. When Pete turned his body, that bothered you because it looked like he was trying to hide the glove box?
A. He left his shoulder almost square to me.
 Q. You said at one point that he refused to make eye contact with you?
A. Yes, sir.
 Q. But then you testified that he kept his eyes on you the whole time while he turned his body?
 A. He avoided eye contact with me until he reached for the glove compartment, at which time he fixed his eyes on me to make sure — to see where I was looking.
Q. Did he say anything?
A. Not at that time, not that I remember.
 Q. Do you find it unusual that if he's acting cautiously because you are there, you're armed, that he wants to make sure you see what he is doing so that you're not troubled by what he is doing?
 A. Caution would be putting his body back on the seat and reaching over so I could see what he was doing, not blocking my view, so that he can reach in the glove compartment while I can see him.
* * *
 Q. You also said that it bothered you that his speech was choppy and fragmented?
A. Yes, sir.
Q. Had you ever heard Pete speak before?
 A. I had not. However, after he'd gotten the registration to me, he seemed to speak a lot better, be able to complete sentences a little better.
 Q. Would you accept that he was feeling more calm now that he had talked with you and things seemed to be going okay?
A. I would.
 Q. So you would agree with me that the book bag, by itself, wasn't a major issue to you?
 A. Nothing, by itself, is a major issue, sir, but the totality of the circumstance is what I was concerned about.
 Q. I want to make sure I got the totality. The book bag not having books in it, his speech was initially choppy and then he calmed down, and he turned funny reaching toward the glove box?
A. As well as the avoidance of eye contact.
Q. But then he did make eye contact with you directly?
A. To see if I was looking, yes, sir.
The testimony of Trooper Kovach, in our judgment, may well have supported a hunch that the car contained contraband, but it did not support a reasonable articulable suspicion that it did. The Kerns case, upon which the trial court relied, involved more compelling facts than the facts here.
In Kerns, the police had stopped a car for traffic violations, but pursuant to an anonymous tip "that a purple Monte Carlo driven by Charles Kerns was en route to an address on Farmersville-West Carrollton Road, and that Kerns had a gun and possibly a hundred pounds of marijuana in the car."
In concluding that the police had a sufficient basis for detaining Kerns we stated:
 We are more impressed with the State's fallback argument: that when Sgt. Copher requested that a drug sniffing dog be brought to the scene, the officers had a reasonable articulable suspicion that drugs were in the car. All agree that, standing alone, the anonymous tip did not furnish the officers with a reasonable articulable suspicion that Kerns was transporting marijuana in the Monte Carlo. Florida v. J.L. (2000), 120 S.Ct. 1375; Alabama v. White (1990), 496 U.S. 325. However, by the time Sgt. Copher requested the drug sniffing dog, the officers had more to go on than the anonymous tip. They observed a car matching the tipster's description turn onto Farmersville-West Carrollton Road, where there was an address to which the tipster said the Monte Carlo was headed. The driver of the Monte Carlo was Kerns, as the tipster had said it would be. Kerns demonstrated considerable anxiety when he was stopped, a remarkable reaction by someone stopped for minor traffic violations. Finally, although not articulated at the suppression hearing as a basis for calling for the dog, Kerns had given the officers permission to search the interior of his car for the license plate and evidence of insurance, but he had refused a specific request by the officers to search the trunk. All of these phenomena, observed by the officers, were consistent with the tip and lent reliability to it, such as to furnish them with a reasonable articulable suspicion to suspect the car contained drugs and justification to detain Kerns until a drug sniffing dog could confirm — or dispel — their suspicion.
In this case, Trooper Kovach, although thinking something might have been amiss, never articulated or even attempted to articulate what that something was. Although his calling for the drug sniffing dog supports an inference that he suspected the car was transporting drugs, he never pointed to anything — except perhaps Byczkowski's shielding the glove box — that supported that suspicion. In Kerns, the police definitely suspected drugs based on the anonymous tip. It does not appear that Trooper Kovach suspected that Byczkowski was armed or that the car contained weapons.
Having concluded that Trooper Kovach lacked a reasonable, articulable suspicion that the car contained contraband, his continued detention of Byczkowski after completing the traffic violations paperwork was improper. The marijuana found in the car should have been suppressed.
The assignment of error is sustained.
The judgment of conviction on the marijuana charge only will be reversed, and the matter will be remanded to the trial court for further proceedings.
FAIN, J. and GRADY, J., concur.