OPINION
Appellant, Timothy Cahill, appeals the December 10, 2001 judgment entry of conviction and sentencing of the Common Pleas Court of Shelby County, Ohio.
On March 7, 2001, Trooper Jon Payer of the Ohio State Highway Patrol stopped a white Chevrolet Blazer driven by Cahill on Interstate 75 for following the vehicle in front of him too closely, a violation of Revised Code section 4511.34. Shortly after stopping Cahill's vehicle, Trooper Payer asked Cahill to have a seat in the back of his police cruiser because he could not hear Cahill speaking and had some safety concerns. Cahill cooperated with the request and sat inside the cruiser. Trooper Payer then informed Cahill of the nature of the stop and proceeded to call the dispatcher in order to run a check of Cahill's driver's license, criminal history, and the vehicle registration. Trooper Payer also called another trooper, a canine unit, to assist in the stop. While Cahill was in the back of the cruiser, Trooper Payer asked him various questions and learned that Cahill had driven to Ohio from California, visited his brother in Middletown, Ohio, and was driving to Wayne, Michigan, to look for work as an electrician.
Trooper Darren Fussner and his drug-sniffing dog, Buckeye, responded to Trooper Payer's call for assistance. Upon arriving at the scene, Trooper Fussner and Buckeye proceeded to walk around the outside of Cahill's vehicle, with Buckeye sniffing door seams, wheel wells, fuel doors, truck seams, and any other place from which odors were likely to escape. At the right rear tire well of Cahill's vehicle, Buckeye abruptly stopped and began to aggressively sniff that area of the vehicle. However, he did not indicate the presence of drugs to Trooper Fussner at that time.
After witnessing Buckeye's actions, Trooper Payer asked Cahill for permission to search the vehicle. Cahill refused this request, and Trooper Payer then told Trooper Fussner over the CB to conduct a search of Cahill's vehicle. However, a miscommunication occurred between the troopers, and Trooper Fussner did not search the vehicle at that time. Trooper Payer then exited his cruiser and spoke with Trooper Fussner, directing him to walk Buckeye around Cahill's vehicle again. During this second walk, Buckeye again stopped at the right rear tire well and then immediately indicated the presence of drugs by scratching on the back of the vehicle. At that time, Trooper Payer ordered a search of Cahill's vehicle. Trooper Fussner and two other troopers, who had arrived at the scene, then conducted a search of Cahill's vehicle. Upon searching the vehicle, the troopers found a large amount of marijuana and cocaine. Trooper Payer then placed Cahill under arrest.
Cahill was indicted by the grand jury on March 14, 2001, on two counts: Count I — possession of cocaine, specifically 546 grams of cocaine, a first degree felony; and Count II — possession of marijuana, specifically 34,473 grams, a second degree felony. Thereafter, he pled not guilty to both offenses. On April 12, 2001, Cahill filed a motion to suppress, stating that there was no reasonable suspicion or probable cause to stop him on that day and that the subsequent search was unwarranted. Cahill filed a second motion to suppress on May 2, 2001, this time stating that the troopers detained him after the purpose of the stop had ended and that the search was conducted without probable cause. Also on that date, Cahill filed a demand for discovery. All video/audio tapes, videotape of the stop, including audio, and audio radio transmissions prior to, during, and after the stop were among the items requested in Cahill's demand for discovery. On June 20, 2001, Cahill filed a motion to compel discovery, specifically, radio traffic logs from the stop and any videotapes regarding the incident. Cahill then filed a motion to dismiss on July 3, 2001, stating that the State had failed to comply with his discovery requests.
A hearing was held on the motions to suppress on July 3, 2001. In addition, the issues regarding Cahill's discovery requests were addressed at that time. Before hearing the evidence relevant to the suppression issues, the trial court stated that it would take the suppression motions under advisement and ordered the State to immediately produce any tapes, audio and visual, that it had regarding the stop. The court further informed the parties that it would not allow the discovery problem to jeopardize or prejudice the defense and that it would permit Cahill to supplement the record if, after reviewing the tapes, he felt that something in the tapes would aid these motions. The court then proceeded to hear the evidence regarding the March 7, 2001 stop. Both Trooper Payer and Trooper Fussner testified about the details of the stop. In addition, Trooper Payer also testified about the status of the videotape and radio log information. No other witnesses testified at the suppression hearing.
After receiving notice from the State that the audiotapes of his stop did not exist, Cahill filed a memorandum in support of his motion to dismiss and of his motion to suppress on August 6, 2001. On September 14, 2001, the trial court overruled the motions to suppress and the motion to dismiss. Pursuant to plea negotiations, the State amended Count I of the indictment to reflect a charge of attempted possession of drugs, specifically cocaine, a second-degree felony, but Count II remained unchanged. In exchange for this amendment, Cahill changed his former plea of not guilty as to both counts to that of no contest on October 16, 2001. The court accepted his plea on that same date and found him guilty on both counts. Thereafter, a pre-sentence investigation report was made, and on November 30, 2001, the trial court held a sentencing hearing.
The court sentenced Cahill to mandatory imprisonment for two years on Count I and to mandatory imprisonment for eight years on Count II.[1]
The court further ordered that the sentences be served consecutively. The trial court then filed a written judgment entry of sentencing on December 10, 2001, reflecting its decision at the sentencing hearing. This appeal followed, and Cahill now asserts three assignments of error.
 "THE TRIAL COURT ERRED WHEN IT FAILED TO GRANT APPELLANT'S MOTION TO DISMISS THE CHARGES."
 "THE TRIAL COURT ERRED BY FAILING TO SUSTAIN THE SUPPRESSION MOTION."
 "THE TRIAL COURT FAILED TO ADEQUATELY STATE REASONS FOR IMPOSING CONSECUTIVE SENTENCES SO THIS COURT SHOULD EITHER REMAND FOR A NEW SENTENCING HEARING OR ORDER THE TERMS TO BE SERVED CONCURRENTLY."
 First Assignment of Error
In his first assignment of error, Cahill asserts that the trial court abused its discretion in not granting his motion to dismiss the indictment, which was based upon the State's failure to preserve the video and audio tapes of the stop despite his discovery request. When a party in a criminal proceeding fails to comply with a discovery request, the trial court "may order such party to permit the discovery or inspection, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it may make such other order as it deems just under the circumstances." Crim.R. 16(E)(3) (emphasis added). Both the decision to impose a sanction and the nature of the sanction, itself, are within the discretion of the trial court, and those decisions will not be reversed absent an abuse of that discretion. SeeCity of Lakewood v. Papadelis (1987), 32 Ohio St.3d 1, 3-4. However, the trial court "must inquire into the circumstances surrounding a violation of Crim.R. 16 prior to imposing sanctions pursuant to Crim.R. 16(E)(3)."Id. at 5; see also State v. Edwards (1993), 86 Ohio App.3d 550, 555. In addition, the trial court "must impose the least severe sanction that is consistent with the purpose of the rules of discovery." Edwards,86 Ohio App.3d at 555 (citing Papadelis, 32 Ohio St.3d at 5).
Cahill contends that the trial court should have granted his motion to dismiss because the State destroyed evidence that he believes would have been exculpatory, thus violating his right to due process. A criminal defendant is denied due process when the State fails to preserve materially exculpatory evidence or destroys potentially useful evidence in bad faith. State v. Benton (2000), 136 Ohio App.3d 801, 805 (citingCalifornia v. Trombetta (1984), 467 U.S. 479, 489; Arizona v. Youngblood
(1988), 488 U.S. 51, 58). The United States Supreme Court has held that a State's failure to preserve evidence does not automatically render such failure a constitutional defect, which would warrant a dismissal of the charge. Trombetta, 467 U.S. at 488. In Trombetta, the Court specifically noted that "[w]hatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense."Id. Thus, the "evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means" in order to constitute a denial of due process. Id. at 489.
Typically, the burden of proving that lost or destroyed evidence is materially exculpatory and that the evidence cannot be obtained by other reasonable methods is placed on the defendant. See Id. at 488-489; Cityof Columbus v. Forest (1987), 36 Ohio App.3d 169, 171-172. However, when a defendant requests evidence and the State fails to respond in good faith to such a request, the State then bears "the burden of proof as to the exculpatory value of the evidence." Forest, 36 Ohio App.3d at 173
(citation omitted).
In the instant case, Cahill requested any video and/or audiotapes regarding the March 7, 2001 stop on May 2, 2001. However, Trooper Payer testified at the July 3, 2001 suppression hearing that radio log transmissions are ordinarily maintained by the Piqua Patrol Post for thirty days. After the hearing, the State filed a notice regarding discovery on July 11, 2001, which stated that no audiotapes of the stop existed. Given the evidence demonstrating that radio log transmissions are only maintained for thirty days after an incident and the fact that Cahill's request was not made within this time period, the burden of showing the exculpatory value of the audiotapes and that the evidence could not be obtained by other reasonable methods remains with Cahill. Thus, we next examine whether Cahill has satisfied this burden.
Trooper Payer testified during the suppression hearing that Cahill was driving too closely to the vehicle in front him, in violation of R.C.4511.34, based upon his observations that Cahill was never farther than thirty feet from the preceding vehicle while Trooper Payer was following him. In addition, Trooper Fussner corroborated Trooper Payer's testimony regarding Cahill's driving. Despite this testimony, Cahill presented no witnesses at the suppression hearing to refute the testimony of the two troopers. In fact, Cahill merely asserts in his brief to this Court that he believes any evidence contained on the audiotapes would be exculpatory, yet he provides no basis for this assertion. Therefore, Cahill has failed to show the exculpatory value of the radio transmissions. Furthermore, the questioning of the witnesses by counsel for Cahill reveals that he was able to view the videotape of the stop prior to the suppression hearing. This video contains audio, allowing all radio conversation during the stop to be heard. Thus, Cahill has also failed to show that he was unable to obtain comparable evidence by other reasonably available means. Moreover, the videotape reveals that none of the radio transmissions contained any exculpatory evidence, which further defeats the first prong of Trombetta. Therefore, Cahill was not denied due process by the absence of the requested audiotape.
However, our inquiry does not end here. Cahill further asserts that he was denied due process by the State's failure to preserve the videotape of the stop in its entirety. The State does not dispute the fact that Cahill requested the videotape of the stop nor does it dispute the fact that the portion of the tape that depicts the events that transpired while Trooper Payer was following Cahill prior to stopping him were deleted during an attempt to copy the tape. The trial court correctly found that the burden of proof as to the exculpatory nature of the deleted portion of the videotape shifted to the State because the State breached its duty to respond in good faith to Cahill's request to preserve the videotape evidence. The trial court also correctly found that the State had met its burden.
Trooper Payer testified in great detail about the distance between Cahill's vehicle and the vehicle in front of him. He testified that he began to follow Cahill when he observed Cahill abruptly switch lanes and get behind a maroon minivan. Trooper Payer further testified that he followed Cahill for approximately four miles and at no point was Cahill's vehicle more than two car lengths behind the minivan. In addition, Trooper Payer observed Cahill repeatedly apply his brakes in order to increase the distance between his vehicle and the minivan. The trooper further testified that thirty feet (two car lengths) is not a safe distance between two vehicles that are traveling at approximately 65 m.p.h., according to the guidelines established by traffic crash reconstruction.[2] In addition to this testimony, Trooper Fussner testified that he observed Cahill "hit his brakes as he went by us really hard and he jerked the vehicle over into the right lane, right in behind I believe a maroon van." Once again, Cahill presented no evidence in contravention of this testimony. Given that the testimony of the two troopers went undisputed, we find that the State met its burden of demonstrating that the deleted videotape evidence did not have any exculpatory value.[3] Therefore, this assignment of error is overruled.
 Second Assignment of Error
Cahill asserts in his second assignment of error that the trial court erred by failing to grant his suppression motion. In support of this assertion, Cahill contends that Trooper Payer did not have reasonable suspicion for stopping his vehicle and that his detention was longer than necessary to effectuate the purpose of the stop. The Ohio Supreme Court has held that "[w]here a police officer stops a vehicle based on probable cause that a traffic violation has occurred or was occurring, the stop is not unreasonable under the Fourth Amendment to the United States Constitution even if the officer had some ulterior motive for making the stop[.]" City of Dayton v. Erickson (1996), 76 Ohio St.3d 3, syllabus (following United States v. Ferguson (6th Cir. 1993), 8 F.3d 385). Cahill asserts in his first argument that Trooper Payer failed to articulate sufficient facts to justify the stop and that his subjective criteria for the required distance between two vehicles is not a proper basis for a reasonable stop. We disagree.
Trooper Payer testified that he initiated the traffic stop of Cahill's vehicle because Cahill was following the minivan too closely, a violation of R.C. 4511.34. Revised Code section 4511.34, in pertinent part, states that "[t]he operator of a motor vehicle * * * shall not follow another vehicle * * * more closely than is reasonable and prudent, having due regard for the speed of such vehicle * * * and the traffic upon and the condition of the highway." As previously stated, Trooper Payer and Trooper Fussner both testified that Cahill abruptly hit his brakes and changed lanes, positioning his vehicle directly behind the minivan. Trooper Payer further testified that he followed Cahill for approximately four miles and at no point was Cahill farther than thirty feet from the minivan. In fact, Trooper Payer testified that Cahill had to repeatedly apply his brakes while following the minivan in order to increase the distance between the two vehicles, which prompted the trooper to initiate the traffic stop. In addition, Trooper Payer testified that he relied on established guidelines, which provide that a vehicle traveling at 65 m.p.h. should be at least 143 feet behind the preceding vehicle, in making his determination that Cahill was following the minivan too closely. Furthermore, Cahill provided no evidence to refute the evidence presented by the State. Based upon the undisputed testimony of the troopers and the language of the relevant statute, this Court finds that the trooper not only had a reasonable suspicion of the occurrence of a traffic violation but also that probable cause existed to stop Cahill for a traffic violation. Thus, the trial court did not err in denying Cahill's motion to suppress based upon his contention that the stop was unlawful.
However, Cahill also asserts that the evidence acquired during the search of his vehicle should have been suppressed because he was unlawfully detained beyond the time necessary to effectuate the purpose of his stop. In conducting a stop of a motor vehicle for a traffic violation, an "officer may detain an automobile for a time sufficient to investigate the reasonable, articulable suspicion for which the vehicle was initially stopped." State v. Smith (1996), 117 Ohio App.3d 278,285. However, the duration of the stop "is limited to `effectuate the purpose for which the initial stop was made.'" Id. (quoting State v.Venham (1994), 96 Ohio App.3d 649, 655, citing United States v.Brignoni-Ponce (1975), 422 U.S. 873; State v. Chatton (1984),11 Ohio St.3d 59, 63; State v. Bevan (1992), 80 Ohio App.3d 126, 129). "Thus, when detaining a motorist for a traffic violation, an officer may delay the motorist for a time period sufficient to issue a ticket or a warning." Smith, 117 Ohio App.3d at 285 (citing State v. Keathley
(1988), 55 Ohio App.3d 130). This time period also includes the period of time sufficient to run a computer check on the driver's license, registration, and vehicle plates. See Delaware v. Prouse (1979),440 U.S. 648, 659. However, the detention of a stopped driver may only continue beyond this time frame when "additional facts are encountered that give rise to a reasonable, articulable suspicion [of criminal activity] beyond that which prompted the initial stop[.]" Smith, supra
(citing State v. Myers (1990), 63 Ohio App.3d 765, 771; State v. Venham
(1994), 96 Ohio App.3d 649, 655).
In addition, a lawfully detained vehicle may be subjected to a canine sniff of the vehicle's exterior even without the presence of a reasonable suspicion of drug-related activity. State v. Rusnak (1997),120 Ohio App.3d 24, 28. Both Ohio courts and the Supreme Court of the United States have determined that "the exterior sniff by a trained narcotics dog to detect the odor of drugs is not a search within the meaning of the Fourth Amendment to the Constitution." Id. (citations omitted); United States v. Place (1983), 462 U.S. 696. Thus, a canine sniff of a vehicle may be conducted during the time period necessary to effectuate the original purpose of the stop. The Ohio Supreme Court has further determined that "[t]he well-established automobile exception allows police to conduct a warrantless search of a vehicle if there is probable cause to believe that the vehicle contains contraband or other evidence that is subject to seizure, and exigent circumstances necessitate a search or seizure. Chambers v. Maroney (1970), 399 U.S. 42,51, 90 S.Ct. 1975, 1981, 26 L.Ed.2d 419, 428; Carroll v. United States
(1925), 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. The mobility of automobiles often creates exigent circumstances, and is the traditional justification for this exception to the Fourth Amendment's warrant requirement. California v. Carney (1985), 471 U.S. 386, 391,105 S.Ct. 2066, 2069, 85 L.Ed.2d 406, 413." State v. Mills (1992),62 Ohio St.3d 357, 367. Moreover, if a trained narcotics dog "alerts to the odor of drugs from a lawfully detained vehicle, an officer has probable cause to search the vehicle for contraband." State v. French
(1995), 104 Ohio App.3d 740, 749 (citation omitted).
In the case sub judice, the clock on the videotape shows that Cahill was first stopped at 10:21 a.m. Trooper Payer then approached the passenger side of Cahill's vehicle and began talking to him about the reason for the stop. The trooper testified that he was unable to hear Cahill because Cahill would not look at him while talking. Therefore, Trooper Payer had Cahill sit in the back seat of his police cruiser at 10:25 a.m. Trooper Payer then informed Cahill of the reason that he was stopped. Next, the trooper ran a check of Cahill's license, registration, vehicle identification number, and criminal history. Trooper Payer also requested that the canine unit come to assist him in the stop at that time. At 10:31 a.m., Trooper Payer began writing the traffic ticket. During this time, Cahill and Trooper Payer talked with one another. Trooper Payer further explained the reason for the stop, including the reason that following too closely is prohibited and the basis for ascertaining a minimum safe distance. At 10:36 a.m., the dispatcher informed the trooper that Cahill was once charged with manslaughter. Trooper Payer then requested that the dispatcher run a criminal history check of Cahill in California, where Cahill lived at the time. Trooper Payer then informed Cahill that he noticed that Cahill was nervous, asked him about the manslaughter charge, and admitted to Cahill that he had some safety concerns. He then continued to write the ticket. Trooper Fussner and Buckeye arrived at the scene of the stop and began to walk around Cahill's vehicle at 10:41 a.m., twenty minutes after Cahill was first stopped by Trooper Payer.
Troopers Fussner and Payer both testified at the suppression hearing that the drug dog "alerted" to drugs in the vehicle. Trooper Fussner explained that an "alert" to the possible presence of drugs occurs when the dog's behavior changes and that an "indication" occurs when the dog actually scratches an area of the vehicle. The trooper further testified that while working along the right rear tire well on the first walk, Buckeye's head jerked back and he began to aggressively sniff the tire well. Trooper Payer then told Trooper Fussner to go ahead and search the vehicle, but a miscommunication occurred and the vehicle was not searched. Trooper Payer then asked Cahill for his consent to search the vehicle and filled out a consent to search form. However, Trooper Payer testified that Cahill's behavior changed dramatically and he adamantly refused to consent to the search. After this conversation, Trooper Payer exited his cruiser and spoke with Trooper Fussner about Cahill's sudden behavioral change. He then told Trooper Fussner to walk around the vehicle once more. At 10:57 a.m., Trooper Fussner began to walk Buckeye around the vehicle again, and Buckeye immediately indicated the presence of drugs by aggressively scratching the back of Cahill's vehicle. Trooper Fussner and two other troopers then searched Cahill's vehicle and found marijuana and cocaine.
Trooper Payer testified that issuing a traffic ticket ordinarily takes him twenty to thirty minutes. The initial canine sniff occurred within this time frame. In addition, when Trooper Payer discovered that he was dealing with a potentially dangerous person, this routine traffic stop was no longer routine because his personal safety then became more of a concern. Thus, for purposes of officer safety, the trooper was entitled to make further inquiry about the potential danger that Cahill possibly posed to him, which would justifiably extend the necessary time period of the stop. Moreover, once Buckeye alerted to the possible presence of drugs, the troopers had the requisite probable cause to search the vehicle. The additional canine sniff was conducted as a result of this alert and further served to solidify the existence of probable cause that the vehicle contained illegal drugs. Therefore, we conclude that, under the facts and circumstances of this case, Cahill was not detained longer than constitutionally permitted. Thus, the trial court did not err in denying Cahill's motion to suppress, and the second assignment of error is overruled.
 Third Assignment of Error
Cahill next asserts that the trial court failed to adequately state its reasons for imposing consecutive sentences upon him. In determining what sentence to impose upon a defendant, a trial court is "granted broad discretion in determining the most effective way to uphold" the two overriding purposes of felony sentencing: "to protect the public from future crime and to punish the offender." State v. Avery (1998),126 Ohio App.3d 36, 50. Trial courts are required "to make various findings before properly imposing a felony sentence." State v. Alberty
(Mar. 28, 2000), Allen App. No. 1-99-84, 2000 WL 327225. In fact, the trial court's findings under R.C. 2929.03, 2929.04, 2929.11, 2929.12,2929.14, and 2929.19, in effect, determine a particular sentence, and a sentence unsupported by these findings is both incomplete and invalid. See State v. Martin (1999), 136 Ohio App.3d 355.
When a defendant is convicted of multiple offenses, the sentencing court is to impose concurrent sentences unless it finds that consecutive sentences are warranted pursuant to R.C. 2929.14(E)(4). See R.C.2929.41(A). Ohio Revised Code section 2929.14(E)(4) provides, in pertinent part: "If multiple prison terms are imposed on an offender for convictions of multiple offenses, the court may require the offender to serve the prison terms consecutively if the court finds that the consecutive service is necessary to protect the public from future crime or to punish the offender and that consecutive sentences are not disproportionate to the seriousness of the offender's conduct and to the danger the offender poses to the public, and if the court also finds any of the following: * * * (b)The harm caused by the multiple offenses was so great or unusual that no single prison term for any of the offenses committed as part of a single course of conduct adequately reflects the seriousness of the offender's conduct."
In making this determination, the "trial court must strictly comply with the relevant sentencing statutes by making all necessary findings on the record at the sentencing hearing[,]" as well as specify the basis of its findings when necessary. State v. Alberty, supra (citing State v.Bonanno (June 24, 1999), Allen App. Nos. 1-98-59, 1-98-60, 1999 WL 456439). "When consecutive sentences are imposed under R.C. 2929.14, the trial court must also follow the requirements set forth in R.C.2929.19(B)." State v. Rouse (Sept. 23, 1999), Aug. App. No. 2-99-13, 1999 WL 797052, at *3. Ohio Revised Code section 2929.19(B)(2) provides that "a court shall impose a sentence and shall make a finding that gives its reasons for selecting the sentence imposed in any of the following circumstances: * * * (c) If it imposes consecutive sentences under section 2929.14 of the Revised Code, its reasons for imposing the consecutive sentences."
In the case sub judice, a review of the transcript of the hearing reveals that the trial judge stated on the record that he reviewed the pre-sentence investigation report and was familiar with the facts of the case, having conducted the suppression hearing. The court then stated that "there's no question in the — in the Court's mind but that you are a major drug offender." The court further stated Cahill brought 76 pounds of marijuana, with an estimated street value of $170,000.00, and a pound of cocaine, worth approximately $55,000.00, into the community. Furthermore, the court stated that "[i]t's people like you that I think the legislature had in mind when they drafted stiff drug penalties * * * because of the drugs that you bring into the community." In addition, the trial court found that Cahill "committed the worst form of the offense, that the harm [he] caused is so great that a single term does not adequately reflect the seriousness of [his] conduct and the need to protect the public and to punish [him]." The court then ordered the two sentences to be served consecutively.
Although the trial court did not quote the exact language of R.C.2929.14(E)(4) during the sentencing hearing, the record indicates that in this instance the court adequately discussed and made the necessary findings. Therefore, the court complied with the statutory requirements of R.C. 2929.14(E) in sentencing Cahill to consecutive prison terms. Thus, the third assignment of error is overruled.
For all of these reason, Cahill's assignments of error are overruled and the judgment of the Common Pleas Court of Shelby County, Ohio is affirmed.
Judgment affirmed.
BRYANT, J., concurs.
WALTERS, J., concurring separately.
[1] The court also imposed two mandatory fines of $7,500.00 each, one for each count. However, the imposition of these fines is not in dispute.
[2] Trooper Payer testified that he actually registered Cahill's speed at 68 m.p.h. with his radar gun as Cahill passed him while he was sitting in the median of I-75, although the posted speed limit for passenger vehicles on that portion of the roadway is 65 m.p.h. He also testified that the guidelines state that 143 feet is the minimum safe distance at that rate of speed.
[3] Although Cahill argues in his brief to this Court that the deleted portion of the videotape is the only objective view of the circumstances and thus the lack of this objective evidence denied him due process, the cases to which he cites in support of this contention involve circumstances where the defendant presented testimonial evidence that was contrary to the arresting officer's testimony. However, Cahill did not do anything of the sort at the suppression hearing.